## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

|  |  |
|---|---|
| PROPERTIES OF THE VILLAGES, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> FEDERAL TRADE COMMISSION, <br><br> *Defendant*. | Civil Action No. _____ |

## **COMPLAINT**

Plaintiff Properties of the Villages, Inc., a Florida corporation ("POV"), brings this suit against Defendant Federal Trade Commission ("FTC" or "Commission") and alleges as follows:

1. As States and courts have long understood, not all non-compete agreements are unreasonable restraints on competition. Rather, the vast majority of States, including Florida, have recognized that non-compete agreements can be procompetitive and beneficial in certain circumstances. Tailored non-compete agreements can encourage businesses to invest in their workforces, including by providing training, allowing access to proprietary information, and sharing relationships with clients, without the risk that those individuals will immediately take that knowledge across the street to a

competitor. Because non-compete agreements can have this salutary function, state laws, as well as federal antitrust laws, have analyzed the legality of these agreements on a case-by-case basis. Casting aside this longstanding tradition without any direction from Congress, the Federal Trade Commission has now taken a one-size-fits-all approach that bans nearly all non-compete agreements, regardless of their scope or actual effect on competition. As applied to POV, the Commission's blanket prohibition would invalidate reasonable non-compete agreements that this Court recently upheld under Florida law. This Court should set aside such clear federal agency overreach.

2.       POV sells real estate in The Villages® ("The Villages"), an active adult community in central Florida. The Villages community started from humble beginnings in the 1980s as a mobile home park with access to free golf. The community grew rapidly thanks to the hard work of The Villages' developers and POV's dedicated sales team. POV models its approach to sales on the distinctive hospitality mindset of its founder Gary Morse, whose values continue to drive every aspect of POV's family business today. Developing personal, lifelong relationships with residents, or "Villagers," is central to POV's business model and brand. Because of the reputation POV has built, both new and returning customers frequently turn to POV and its sales team—rather than third-party real estate brokers—when looking to buy or sell property in The Villages.

3.      Unlike many real estate brokers, POV does not use generalist real estate agents.  Instead, POV contracts with real estate sales associates ("Sales Associates") who work exclusively in The Villages community, ensuring customers receive unparalleled support from team members who are experts in the community's offerings.  Building such a sales force, however, is no easy task.  POV has invested extensive resources to develop an extraordinary training and sales platform that allows its Sales Associates to succeed and thrive.  This starts at the very beginning of a Sales Associate's career and continues throughout their time at POV.  At every step, POV invests enormous resources in Sales Associates and teaches them about POV's unique approach to selling homes in The Villages community.  Indeed, for the most part, POV hires Sales Associates with little to no prior real estate experience, training them from the ground up.

4.      POV Sales Associates do not just receive real estate training; they learn specifically how to sell homes in The Villages.  All new POV Sales Associates participate in an intensive three-month training program, during which POV leadership covers every element of the business and provides one-on-one coaching.  Specifically, POV teaches Sales Associates about the particulars of The Villages community, including its homes, various amenities, lifestyle opportunities, and government structure, as well as other proprietary and client information.  This comprehensive training program, together with

the wealth of information POV provides, allows Sales Associates to quickly learn what distinguishes The Villages from other residential communities. POV's investment and training benefits Sales Associates by ensuring that they have the information and skills needed to successfully sell homes in The Villages.   Prospective and current Villagers also benefit from POV's investment because customers know that when they contact POV, they will get exceptionally knowledgeable and skilled Sales Associates.

5.      Beyond training, Sales Associates are also able to capitalize on the strong brand recognition and goodwill generated by POV and The Villages. For example, hundreds of thousands of unique visitors go directly to The Villages' website every month to learn about the community, including homes for sale. POV directs these prospective clients to Sales Associates, in addition to others that express interest in The Villages lifestyle through walk-ins, calls, and open houses.  Thus, instead of pounding the pavement for business, as ordinary real estate agents must, POV's Sales Associates enjoy access to a steady stream of new and returning customers, all provided by POV.   This allows Sales Associates to focus on serving customers, rather than finding them.  Access to POV's customer base is also particularly valuable because Villagers often relocate within The Villages multiple times; and Villagers and their families may turn to the same POV Sales Associates for future sales.

6.      POV's model benefits its Sales Associates as well as its customers. This model could not exist, however, without some reasonable restrictions on what a Sales Associate could do with the knowledge, training, and resources that POV provides.  If, for instance, a Sales Associate could attend POV's three-month training program, only to walk across the street to a competitor the day after completion, POV would have little incentive to provide that training.

7.      Therefore, in exchange for the many benefits and opportunities that POV offers, Sales Associates sign tailored non-compete agreements in which they agree that, for 24 months after they depart POV, they will not compete to sell homes within The Villages community—a geographic area that is limited to approximately 58,000 acres within central Florida, less than one-tenth of a percent of Florida.  Former Sales Associates remain free to sell real estate anywhere else in the State, and, after the relatively short cool-down period, may return to selling in The Villages.  This agreement gives POV confidence that its competitors will not be able to free ride off of its sizeable investment in Sales Associates, while ensuring that Sales Associates may continue to earn a living in their profession, even if they choose to leave the POV family.

8.      POV's non-competes illustrate why Florida and many other States allow non-competes in appropriate circumstances.  Limited and reasonable non-compete agreements can promote economic investment.  As the authors of

Florida's non-compete statute remarked, "the legislature made certain that it is a balanced statute that does not unnecessarily impede competition, the ability of competitors to hire experienced workers, or the efforts of employees to secure better-paying positions."   John A. Grant, Jr. & Thomas T. Steele, *Restrictive Covenants: Florida Returns to the Original "Unfair Competition" Approach for the 21st Century,* 70 Fla. B.J. 53, 55 (Nov. 1996).   To that end, Florida's statute does not generally allow all non-compete agreements, but instead limits their use to the protection of legitimate business interests—that is, "business asset[s] that, if misappropriated, would give [their] new owner an unfair competitive advantage over its former owner."  *Id*. at 54.   By striking this balance, many States enable businesses, like POV, to invest in their team members—including by providing extensive training and sharing access to confidential information, existing client relationships, and goodwill associated with a business's brand—while protecting against the risk that such investments could be co-opted or abused.

9.     Just over three years ago, this Court upheld the reasonableness of the modest restrictions in the POV non-compete agreements.   A group of former Sales Associates left POV—taking with them years of training, large books of POV-provided business, and a wealth of confidential information. Hoping to capture POV's share of any future sales, these former Sales Associates started a competing real estate brokerage firm, marketing homes

6

in The Villages and violating their non-competes.  POV came to this Court for relief.  In response, the former Sales Associates did not deny their conduct, but instead argued that the non-compete agreements were anti-competitive and invalid under Florida law.  Following lengthy and heavily briefed litigation and a trial, this Court disagreed with the former Sales Associates, concluding that under Florida law, POV's non-compete agreements were "valid and enforceable" as both "reasonable in time, area, and line of business" and justified to protect POV's customers; goodwill; and confidential, proprietary, and trade secret information.  *Props. of the Villages, Inc. v. Kranz*, No. 5:19-CV-647-JSM-PRL, 2021 WL 2144178, at *5 (M.D. Fla. May 24, 2021).

10.     This case is not about re-litigating *Kranz*.  This Court has already determined that, as a matter of fact and law, POV's non-compete agreements are "reasonable in time, area, and line of business" and serve legitimate, procompetitive business interests that the Florida legislature has recognized. *Id.*

11.     Instead, this case is about the Commission's efforts to disregard the reasoned judgments of the Florida legislature and this Court through unprecedented and unlawful regulatory action.  Specifically, on April 23, 2024, just three years after this Court upheld the validity of POV's non-compete agreements, the Commission issued a sweeping rule (the "Non-Compete Rule") purporting to invalidate POV's non-compete agreements, along with nearly

every other non-compete agreement in the country. The Commission's Non-Compete Rule bans virtually all non-compete agreements both prospectively and retrospectively without regard to an individual agreement's scope, duration, or actual effect on competition. The Commission justifies this policy change by declaring that all non-competes are "unfair methods of competition" under Section 5 of the Federal Trade Commission Act of 1914 and that the Commission has legislative rulemaking authority to issue such a blanket ban. Non-Compete Clause Rule, 89 Fed. Reg. 38342, 38502–38503 (May 7, 2024) (to be codified at 16 C.F.R. Part 910).

12. The Commission's assertion of authority in this area upsets the well-established tradition of state regulation of non-compete agreements. The Commission's one-size-fits-all approach supplants state policy judgments on non-compete agreements and disregards the long history of both States and courts evaluating non-compete agreements on a case-by-case basis.

13. The Commission seeks to exercise this unprecedented power, which will have significant economic and political consequences, on a slender reed of statutory authority that breaks upon closer review.

14. *First*, the Commission does not have substantive rulemaking authority regarding "unfair methods of competition" under Section 5 of the FTC Act. *See* 15 U.S.C. § 45(a)(1). The Commission relies on its authority in Section 6(g), an ancillary provision about classifying corporations and issuing

8

procedural rules.  *See* 15 U.S.C. § 46(g).  The text, structure, and history of the FTC Act all confirm that Section 6(g) does not provide the broad authority the Commission now claims.

15.     *Second*, even if the Commission has substantive rulemaking authority with respect to unfair methods of competition, Section 5 of the FTC Act does not permit a blanket ban of virtually all non-compete agreements regardless of their actual effect on competition.  Not all non-compete agreements are *per se* unlawful under the antitrust laws.  The Commission lacks clear direction from Congress to depart from the long history of adjudicating the legality of non-competes on a case-by-case basis in light of their reasonableness.

16.     *Third,* to the extent the Commission seeks to declare preexisting non-compete clauses invalid—including POV's agreements, which have been upheld by this Court and for which POV has already performed its end of the bargain—that would violate the presumption against retroactivity.  Even if the FTC Act gave the Commission the authority to issue substantive rules related to "unfair methods of competition," Congress did not clearly authorize rulemaking that would apply retroactively.

17.     *Fourth*, the Non-Compete Rule is also unconstitutional under the Commerce Clause as applied to POV.  POV's non-compete agreements concern purely intrastate commerce because they prohibit former Sales Associates

from competing with POV to sell houses (an inherently local product) in less than one-tenth of one percent of the land in central Florida. The Commission's power to regulate interstate commerce does not extend to POV's limited non-compete agreements with Sales Associates that have no effect on any labor market or commerce outside of Florida.

18.    *Finally,* even assuming that Congress had authorized the Commission to unilaterally ban broad categories of routine and longstanding agreements as "unfair methods of competition," such an unbounded delegation of authority would violate the non-delegation doctrine.

19.    Through its Non-Compete Rule, the Commission seeks to reshape the contractual relationships between businesses and individuals on an unprecedented scale.   To do so, the Commission relies on substantive competition rulemaking authority, which it does not have, and labels even the most narrowly drafted non-compete agreements as unfair methods of competition, which they are not.  The Court should invalidate the rule, or alternatively, hold it unlawful as applied to POV.

## PARTIES

20.    Plaintiff Properties of the Villages, Inc., a Florida corporation, sells real estate and residential housing located in The Villages, an active adult community that encompasses approximately 58,000 acres in parts of Lake, Sumter, and Marion Counties, Florida.  Since its founding in the 1980s, The

Villages has grown to a community of over 145,000 "Villagers," due in large part to POV's hard work and unique sales platform.  POV continues to be a family business that invests deeply in its people, including its sales force.  POV is a licensed real estate broker in the State of Florida, *see* Fla. Stat. Ch. 475.

21.     Defendant Federal Trade Commission is an agency of the United States Government, and is headquartered in Washington, D.C.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the United States Constitution.

23.     This Court may award declaratory and injunctive relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702–706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Court's inherent equitable powers.

24.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendant is an agency of the United States, no real property is involved, and Plaintiff resides in this district.  Venue is proper in the Ocala division because POV resides in this division.

## BACKGROUND

### A.    State Regulation Of Non-Compete Agreements

25.    For most of our Nation's history, the States have regulated contractual relationships between businesses and individuals, including certain post-employment limitations known as "non-compete" agreements. A "non-compete" agreement is a type of contract in which an individual agrees not to work for a business's competitors (or otherwise to compete with that business).  In States that permit non-compete agreements, including Florida, the agreements must typically be limited in time, geography, and line of commerce.  Additionally, non-compete agreements must typically advance legitimate, procompetitive business interests.  Non-compete agreements are often clauses within larger agreements that independent contractors or employees sign in exchange for gaining access to a business's unique and specialized training, client base, trade secrets, and other proprietary information through their work with that business.

26.    Non-compete agreements encourage businesses to invest in their workers—including through training, access to confidential information, and sharing client relationships—by reducing the risk that those individuals will leave and immediately use techniques learned and the proprietary information acquired in direct competition.  Accordingly, most States have allowed

businesses and individuals to enter into reasonable non-compete agreements that are limited in scope and duration.

27.   States have adopted varied approaches to regulating non-compete agreements.  States that allow non-competes typically assess whether they are enforceable under a "reasonableness" standard, which considers the geographic scope, duration, and industry breadth of the non-compete, as well as the claimed procompetitive interests the business desires to protect.  *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 644 (1960) (describing nineteenth-century caselaw in New York, Massachusetts, and Rhode Island); *see also, e.g.*, *Pittman v. Harbin Clinic Prof. Ass'n*, 210 Ga. App. 767, 768 (1993) ("[I]f [non-competes] are sufficiently limited and are reasonable, considering the interest to be protected and the effects on both parties to the contract, they will be upheld."); *Empiregas, Inc. of Kosciusko v. Bain*, 599 So. 2d 971, 975 (Miss. 1992) ("The validity and therefore, the enforceability of a non-competition provision is largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope.").

28.   As of May 2024, 46 States and the District of Columbia allow some form of non-compete agreements, whereas only four States—California, Minnesota, North Dakota, and Oklahoma—prohibit such agreements entirely. *See State Noncompete Law Tracker*, Economic Innovation Group (May 22,

2024), https://eig.org/state-noncompete-map/. These varying approaches to non-compete agreements are a classic illustration of States operating as "laborator[ies]" of democracy—"one of the happy incidents of the federal system." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., concurring).

29.    Like most States, Florida recognizes that reasonable non-compete agreements benefit both workers and businesses, and non-compete agreements generally do not violate public policy. *See* Fla. Stat. § 542.335(1)(i). In Florida, non-compete agreements are enforceable "so long as such contracts are reasonable in time, area, and line of business." *Id.* § 542.335(1). Florida law recognizes that violating a non-compete agreement "creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." *Id.* § 542.335(1)(j).

30.    Courts applying Florida law assess the validity of non-compete clauses on a case-by-case basis. Specifically, "[t]he person seeking enforcement of a [non-compete clause] shall plead and prove the existence of one or more legitimate business interests justifying the [non-compete clause]." *Id.* § 542.335(1)(b). Examples of "legitimate business interests" include: confidential business information; substantial relationships with specific prospective or existing customers; customer goodwill associated with an ongoing business practice, such as trademarks, a specific geographic location,

14

or a specific marketing or trade area; and extraordinary or specialized training. *Id.* "A person seeking enforcement of a restrictive covenant also shall plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." *Id.* § 542.335(1)(c).

### B.   POV's Business And Need For Non-Compete Agreements

31.   In addition to selling all new homes in The Villages, POV also offers resales in the community.  As the leading real estate broker in The Villages, POV has a unique business model that relies on a distinctive hospitality mind-set.  POV focuses on creating enduring relationships with customers that may last decades and generations.  As a result, POV's customers (and their children) often become repeat clients.

32.   Building these relationships requires a significant investment by POV and its sales team.  New POV Sales Associates all complete an intensive three-month training course.  To enable new Sales Associates to participate in the program full time, POV provides participants with a stipend in the form of an advance on future commissions.  An intensive training period with pay is virtually unheard of in the real estate business, and this early investment in Sales Associates is one of the substantial benefits that distinguishes POV from its competitors.

33.   POV has partnered with nationally recognized experts to design this comprehensive program specifically tailored to sell homes in The Villages. The program covers the history of The Villages and its culture, the neighborhoods within the community, and proprietary sales techniques that have been successful in The Villages. By the end of the three-month program, Sales Associates have a unique, comprehensive understanding of the community and a deep knowledge of how to sell properties effectively in The Villages. In short, POV's training program equips Sales Associates with the tools to succeed on day one.

34.   These efforts require substantial resources from POV. POV staff collectively dedicate hundreds of hours to presenting the various modules of the program—covering everything from relationship building to personalizing their sales approach with clients. POV also pairs each new Sales Associate with a more experienced Sales Associate mentor, and each mentor receives a bonus from POV for participating in the program. Additionally, POV pays to bring in outside speakers for presentations to participants.

35.   Sales Associates receive extraordinary benefits from the training program. POV distills years of acquired knowledge about The Villages and communicates it to Sales Associates over the course of three months. Before a Sales Associate has made a single sale, the company has heavily invested in preparing that Sales Associate to meaningfully serve customers in The

Villages.   Sales Associates also gain access to confidential business information, including POV's exclusive "Villages Listing Service" (colloquially known as "VLS"), a listing of properties for sale in The Villages, which enables Sales Associates to develop connections with current and prospective customers and strengthen their long-term relationships with Villagers. *Kranz*, 2021 WL 2144178, at *2 ("[POV] considers [its clients] customers for life and operates accordingly.").

36.    In addition to training, Sales Associates benefit from access to a large pool of current and prospective clients based on POV's and The Villages' brand and goodwill.  Every month, hundreds of thousands of unique visitors go to The Villages website for information about the community, including homes for sale.   Clients actively reach out to POV through website inquiries, call centers, and walk-ins.   POV's Lifestyle Preview Plan also leads to more business for Sales Associates by allowing prospective clients to stay at a home in The Villages community for a short period of time to give them a glimpse of what it might be like to live there.   POV's significant investments to attract clients and The Villages' brand recognition helps Sales Associates thrive, allowing new associates to have a large pool of clients from the start.

37.    As a nationally recognized real estate consultant has testified, POV's training is extraordinary compared to other companies in the industry. *Kranz*, 2021 WL 2144178, at *2.  Most real estate brokerages do not offer any

training, much less a three-month specialized course with pay. Agents for traditional real estate brokerages often need to learn the business on their own and grow a client base from scratch. By contrast, POV invests in Sales Associates from the beginning and equips them with tools to succeed. As a result, Sales Associates with no prior real estate training have been able to succeed at POV, including rising to the top ranks of leadership.

38. In exchange for this in-depth training, access to sensitive proprietary information, and pipeline of potential clients, all Sales Associates agree to sign and abide by limited non-compete agreements with POV.

39. These agreements require Sales Associates to refrain from acting as real estate representatives within The Villages community for 24 months after their engagement with POV ends. Notably, POV's non-compete agreement restricts Sales Associates from working as real estate representatives *only* "within the geographic area known as The Villages community as it exists at the time of termination of Salesperson's engagement."



40.   The map above depicts the current boundaries of The Villages community, which cover approximately 58,000 acres entirely within central Florida.   To put that in perspective, POV's non-compete restricts Sales Associates from working as real estate representatives in less than one-tenth of one percent of Florida's land area.   Sales Associates remain able to sell real

estate anywhere else in Florida or the rest of the country.  And Sales Associates are free to sell in The Villages itself after a short cooling off period.

41.    This Court has upheld the reasonableness of POV's limited non-compete agreements, as well as the legitimacy of the business interests on which these non-compete agreements are based.  In December 2019, two former POV Sales Associates formed their own real estate brokerage.  Within days of terminating their sales associate agreements with POV, they began both soliciting current POV Sales Associates to join their company and contacting POV customers, in an effort to divert customers' business from POV and POV Sales Associates.  POV sued to hold its former Sales Associates to their agreements.  As POV explained to this Court, these agreements safeguard POV's legitimate business interests in protecting: customer and client goodwill in The Villages community; relationships with prospective and existing customers; confidential business information and trade secrets; access to The Villages' proprietary systems; goodwill associated with the trademarks "The Villages®" and "Properties of The Villages®"; and the extraordinary and specialized training provided to Sales Associates.  After a bench trial, this Court upheld the enforceability of POV's agreements under Florida's non-compete statute.  *Id.* at *3-9.  The Court further concluded that the non-compete agreement's "restrictions are reasonable in time, area, and line of business" under Fla. Stat. § 542.335(1).  *Id.*

20

42.   As the *Kranz* litigation demonstrates, non-competes are not categorically unlawful under Florida law.  Instead, Florida, like the majority of States, recognizes that reasonable non-competes, like POV's agreements, can and do benefit workers and businesses alike.  Non-competes benefit workers by encouraging businesses to invest more to attract and retain talent.  Non-compete agreements also encourage the free flow of information internally.  In exchange, non-compete agreements give businesses like POV assurance that workers will not take those investments—including training, client relationships, and trade secrets—across the street to another business or start their own.  Customers, including Villagers, also benefit from having access to well-trained and knowledgeable sales staff, so they can make educated decisions about their purchases.

### C.   The Federal Trade Commission

43.   Congress created the Commission in 1914 by enacting the Federal Trade Commission Act.  *See* 15 U.S.C. §§ 41 *et seq.* ("FTC Act").

44.   The FTC is an independent agency composed of five commissioners, who each serve seven-year terms.  No more than three Commissioners can be from the same political party.  The President may only remove Commissioners for cause, defined in the statute as: "inefficiency, neglect of duty, or malfeasance in office."  15 U.S.C. § 41.  Given the limited grounds for removal of its commissioners, the FTC operates without direct

accountability to the President.  In 1935, the Supreme Court upheld the constitutionality of these removal restrictions.  *See Humphrey's Executor v. United States*, 295 U.S. 602, 628 (1935).  Underpinning the Court's reasoning was its view of the Commission as an expert agency that assisted courts in adjudicating antitrust cases and assisted Congress through reports in considering new legislation.  *See id.* at 628 (explaining that "[t]o the extent" the 1935 Commission "exercises any executive function, as distinguished from executive power in the constitutional sense, it does so in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government").

45.    Section 5 of the FTC Act establishes that "unfair methods of competition" are unlawful.  15 U.S.C. § 45(a)(1).  The Act "empower[s]" and "direct[s]" the Commission to "prevent" the use of "unfair methods of competition in or affecting commerce."  *Id.* § 45(a)(2); *see also id.* § 44 (defining "[c]ommerce" to mean "commerce among the several States or with foreign nations").  Since 1914, the Commission has enforced the FTC Act's prohibition on unfair methods of competition through case-by-case adjudication.  *See, e.g.*, *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 71–72 (2021).  In 1938, Congress amended Section 5 to add the authority to prevent "unfair or deceptive acts or practices."  15 U.S.C. § 45(a)(2).

46.    Section 6 of the FTC Act describes "[a]dditional powers of the Commission" that generally relate to its investigative authority.  *Id.* § 46. Distinct and separate from its enforcement authority, the Commission has the power to investigate certain industries or issues and to monitor compliance with consent decrees and antitrust laws.  *See id.* § 46(a), (b), (c), (d), (h), (i), (j). The Commission also has authority to conduct certain ministerial functions, such as publishing reports, *id.* § 46(f), and referring evidence of criminal conduct to the U.S. Attorney General.  *Id.* § 46(k).  Tucked away within this miscellaneous section, under the header "Classification of corporations; regulations," Section 6(g) provides that the Commission shall have the power to "classify corporations" and "to make rules and regulations for the purpose of carrying out the provisions of this subchapter."  *Id.* § 46(g).

47.    Section 6(g) has been part of the FTC Act since 1914, but aside from brief experimentation with consumer protection rulemaking in the 1960s and 1970s, the Commission has not invoked that provision to issue substantive rules proscribing "unfair methods of competition."  *See* Maureen Ohlhausen & Ben Rossen, *Dead End Road:* National Petroleum Refiners Association *and FTC 'Unfair Methods of Competition' Rulemaking*, Truth on the Market (July 13, 2022), https://perma.cc/KX5R-H4B3.  Indeed, "the agency itself did not assert the power to promulgate substantive rules" of any kind "until 1962 and

indeed indicated intermittently before that time that it lacked such power." *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973).

48. In 1975, through the Magnuson-Moss Warranty Act, Congress expressly authorized the Commission to engage in rulemaking with respect to "unfair or deceptive acts or practices." Pub. L. No. 93-637, § 202, 88 Stat. 2183, 2193–96 (codified at 15 U.S.C. § 57a). Tellingly, however, Congress did not extend such explicit substantive rulemaking authority to unfair methods of *competition*. *See* 15 U.S.C. § 45(a)(1).

49. With that explicit grant of rulemaking authority for unfair and deceptive trade practices, Congress also required certain heightened procedural safeguards under a new Section 18 of the FTC Act. *See* 15 U.S.C. § 57a(b)–(e). Additionally, Congress provided the Commission with the authority to pursue civil penalties for knowing violations of "any rule under this [Act] respecting *unfair or deceptive acts or practices*." 15 U.S.C. § 45(m)(1)(A) (emphasis added). In contrast, Congress did not provide for any procedural protections or sanctions for violations of rules for unfair methods of *competition*. It is implausible that Congress intended for the Commission to have expansive substantive competition rulemaking authority without the same explicit grant of authority, procedural protections, and penalties for unfair or deceptive acts or practices.

### D. The Commission's Non-Compete Rulemaking

50. For over a century, when non-compete agreements have been challenged under the antitrust laws, "courts have uniformly found that covenants not to compete should be examined under the rule of reason," which asks whether, under all the circumstances, "'the challenged acts are unreasonably restrictive of competitive conditions' in the relevant market." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) (quoting *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 28 (1911)); *see also Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1560–61 (11th Cir. 1983) (following "an unbroken line of cases holding that the validity of covenants not to compete under the Sherman Act must be analyzed under the rule of reason"); *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963) (applying Section 5 of the FTC Act to hold that "[r]estrictive [non-compete] clauses . . . are legal unless they are unreasonable as to time or geographic scope"); *Or. Steam Navigation Co. v. Winsor*, 87 U.S. 64, 66–67 (1874) (applying common law to assess the reasonableness of a non-compete agreement).

51. Moreover, this Court has held that federal antitrust law does not preempt state law on non-compete agreements, but instead exists in harmony—analyzing them under the same reasonableness framework. *Props. of the Villages, Inc. v. Kranz*, No. 5:19-CV-647-OC-30PRL, 2021 WL 494649, at *2 (M.D. Fla. Jan. 25, 2021) ("There is no case law to support that the federal

antitrust laws preempt Florida's laws on enforcing restrictive covenants. In fact, federal and Florida antitrust laws are analyzed under the same rules and case law."), *report and recommendation adopted*, No. 5:19-CV-647-OC-30PRL, 2021 WL 489636 (M.D. Fla. Feb. 10, 2021).

52.    Against that backdrop, the Commission did not purport to treat non-competes as categorically unlawful for the first century of its existence.

53.    A few months after taking office, President Biden issued an Executive Order specifying an array of antitrust policies for various agencies to consider.  *See* Promoting Competition in the American Economy, Exec. Order No. 13,725, 86 Fed. Reg. 36987 (July 14, 2021).  The Order "encouraged [the Chair of the FTC] to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority under the Federal Trade Commission Act to curtail the unfair use of non-compete clauses and other clauses or agreements that may unfairly limit worker mobility."  *Id.* at 36992. As an Executive Order, this presidential directive could not enlarge or expand the Commission's statutory authority.

54.    By the end of 2021, the Commission began soliciting comments and holding workshops to consider a nationwide ban on non-compete agreements. *See* FTC, *Making Competition Work* (Dec. 6–7, 2021), https://perma.cc/5W84-JZTP.

55.     In November 2022, the Commission issued a Policy Statement announcing an expansive and unprecedented vision of its authority under Section 5 of the FTC Act.  *See* FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition* (Nov. 10, 2022) (Section 5 Policy Statement).

56.     A mere two months later, the Commission proposed a nationwide ban on non-compete clauses.  Press Release, FTC, *FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition* (Jan. 5, 2023), https://perma.cc/M3D5-4TMQ; Non-Compete Clause Rule, 88 Fed. Reg. 3482 (proposed Jan. 19, 2023).   Commissioner Christine Wilson issued a vigorous dissenting statement, noting that the Proposed Rule marked a "radical departure from hundreds of years of legal precedent" and predicting that it would be "vulnerable to meritorious [legal] challenges." 88 Fed. Reg. at 3540.

57.     On April 23, 2024, following a 3-2 vote, the Commission announced the Final Non-Compete Rule, which bans non-compete agreements nationwide regardless of anticompetitive harm or the existence of legitimate business interests.  Non-Compete Clause Rule, 89 Fed. Reg. 38342, 38502–38503 (May 7, 2024) (to be codified at 16 C.F.R. Part 910).   Specifically, under the Non-Compete Rule, the Commission has declared that "it is an unfair method of competition" to "enter into or attempt to enter into a non-compete clause,"

"enforce or attempt to enforce a non-compete clause," or "represent that [a] worker is subject to a non-compete clause." *Id.*

58.     Once the Non-Compete Rule takes effect on September 4, 2024, it will ban virtually all non-compete agreements entered after the effective date. *See* 16 C.F.R. § 910.2(a), 89 Fed. Reg. at 38502–38503. The Non-Compete Rule defines "[n]on-compete clause" as a "term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from: (i) Seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (ii) Operating a business in the United States after the conclusion of the employment that includes the term or condition." 16 C.F.R. § 910.1, 89 Fed. Reg. at 38502.

59.     The Non-Compete Rule also will apply *retroactively* to existing non-compete agreements—with a narrow carveout for "senior executives"— even where individuals had been compensated in exchange for such provisions and even where courts had explicitly upheld the legality of such a provision. *See, e.g.*, *Kranz*, 2021 WL 2144178, at *5 (upholding the POV non-compete agreements).

60.     The Non-Compete Rule's "senior executives" exception applies solely to workers in "policy-making" positions. *See* 16 C.F.R. § 910.1(2), 89 Fed. Reg. at 38502 (defining "[s]enior executive" as a worker who is "in a policy-

28

making position" and meets an annual compensation threshold).  The Non-Compete Rule defines "[p]olicy-making position" in part as a "business entity's president, chief executive officer or the equivalent, any other officer of a business entity who has policy-making authority." *Id.*  The Non-Compete Rule further defines "[p]olicy-making authority" as "final authority to make policy decisions that control significant aspects of a business entity or common enterprise and does not include authority limited to advising or exerting influence over such policy decisions or having final authority to make policy decisions for only a subsidiary of or affiliate of a common enterprise, or any other natural person who has policy-making authority for the business entity similar to an officer with policy-making authority." *Id.*

61.    Prior to 2023, the Commission had never asserted the authority to issue substantive regulations prohibiting non-competes.  Only recently has the Commission discovered this novel, sweeping power in a housekeeping provision of the FTC Act.  Section 6(g) allows the Commission to "classify corporations" and "make other rules," which the Commission's interpretation combines with Section 5's separate proscription of "unfair methods of competition."  But the purported "rulemaking" provision does not grant the Commission authority to make *substantive* rules (i.e., legislative rules with the force of law) defining unfair methods of competition, much less to ban a practice that has never been treated categorically as an "unfair method[] of

competition" under Section 5.  Had Congress intended for the FTC Act to confer this politically and economically significant authority, it would have said so explicitly.

62.     Through the Non-Compete Rule, the Commission has asserted the power to weigh in decisively—at the federal level—on an important, politically significant issue on which States have adopted differing approaches.  *See* Economic Innovation Group, *State Noncompete Law Tracker* (May 22, 2024), https://eig.org/state-noncompete-map/.

63.     Members of Congress have recently introduced various pieces of legislation addressing non-compete clauses.  *See, e.g.*, Freedom to Compete Act of 2023, S. 379, 118th Cong. (Feb. 9, 2023); Workforce Mobility Act of 2023, H.R. 731, 118th Cong. (Feb. 1, 2023).  Congressional efforts to regulate non-compete agreements further confirm that Congress has not granted the Commission such power.

64.     The Non-Compete Rule has tremendous economic significance, too. As the Commission itself notes, "[a]n estimated 30 million workers—nearly one in five Americans—are subject to a noncompete."  FTC, Press Release, *FTC Announces Rule Banning Noncompetes* (Apr. 23, 2024), https://perma.cc/7F3D-54QX.  And the Commission predicts that the Rule will have an impact on wages that exceeds four hundred billion dollars.  FTC, *Fact Sheet on FTC's*

*Proposed Final Noncompete Rule*, https://perma.cc/BFN6-KEEC (Apr. 23, 2024).

65.    If the Non-Compete Rule goes into effect, it will inflict irreparable harm on POV.  The Non-Compete Rule will invalidate POV's existing non-compete agreements with its current and former Sales Associates and prevent POV from entering into non-compete agreements with new Sales Associates. If POV's non-compete agreements are no longer enforceable, POV risks losing Sales Associates, who have access to confidential client information that took POV years to compile; specialized and unique training that POV has provided; and customer goodwill that POV has cultivated over decades.  These former Sales Associates could start a new company or join one of the dozen or so competing real estate brokers that sell homes in The Villages, including by contacting current POV customers and diverting business from existing POV Sales Associates.  Although former Sales Associates will have the benefit of POV's confidential information and trade secrets, they will not have had to shoulder the costs POV incurred to design and operate its proprietary systems, nor will they have to pay for training they received.

66.    As a result, POV will need to alter its current business practices to limit access to important proprietary information to avoid having property listings, client lists, and training materials exploited by its competitors.  And POV may need to reassess who has access to its training program, how many

new Sales Associates it will hire, the extent to which it will expose those new Sales Associates to clients, and the compensation it will provide absent the protection of a non-compete agreement.  All of these changes risk harm to prospective and current Sales Associates and the Villagers who rely on knowledgeable and skilled sales staff, as well as POV.  In sum, in the absence of court intervention, the Non-Compete Rule will adversely affect POV and its existing business model.

## <u>Count I</u>
### *Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) (The Commission Does Not Have Substantive Rulemaking Authority Over Unfair Methods of Competition)*

67.    Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1–66 above.

68.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).  The APA further calls for vacatur of agency action that exceeds the agency's "statutory jurisdiction, authority, or limitations."  *Id.* § 706(2)(C).

69.    The FTC is an "agency" under the APA, 5 U.S.C. § 551(1), and the Non-Compete Rule constitutes a final, reviewable, "agency action," *id.* § 551(13).

70.    The Commission's asserted textual basis for its competition rulemaking authority, Section 6(g) of the FTC Act, merely grants the

32

Commission authority to "classify corporations" and "make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C. § 46(g). The Commission's authority to prevent "unfair methods of competition" is housed separately in Section 5 of the FTC Act. 15 U.S.C. § 45(a)(1). The Commission claims that these provisions, when read together, confer the authority to issue substantive competition rules like the Non-Compete Rule.

71. The text, structure, and history of the FTC Act demonstrate that the Commission lacks substantive rulemaking authority over unfair methods of competition.

72. *First*, no sensible reading of Section 6 could support the substantive rulemaking authority that the Commission claims it confers. Section 6 contains "additional powers" of the Commission that are distinct from its enforcement authority in Section 5. *See* 15 U.S.C. § 46. When read in context with the words to "classify corporations," Section 6(g) is clearly limited to similar procedural or interpretive rules. Congress could not have intended to confer authority to issue substantive competition rules with the force of law in such a miscellaneous, ancillary provision. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

33

73.   *Second*, the structure of the FTC Act reinforces this interpretation. If Congress had granted the Commission competition rulemaking authority, the logical place to confer such authority would have been either in Section 5 itself or in a standalone section like Section 18 of the FTC Act, which Congress added in 1975 through the Magnuson-Moss Warranty Act (codified at 15 U.S.C. § 57a (authorizing the Commission to conduct rulemaking proceedings concerning "Unfair or deceptive acts or practices rulemaking proceedings")). In Section 5(m), Congress also imposed civil monetary penalties for knowing violations of substantive consumer protection rules. *See* 15 U.S.C. § 45(m)(a)(1).   By contrast, civil monetary penalties are not available for violations of competition rules.   Congress's failure to create analogues to Sections 18 and 5(m) confirms that Congress did not intend to give the Commission the same substantive rulemaking authority for "unfair methods of competition" that it did for "unfair or deceptive acts or practices."

74.   *Third*, Section 6(g) has been in effect since Congress created the Commission in 1914, yet the Commission did not assert any substantive rulemaking authority until 1962.  *See* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 551–52 (2002); *see also Nat'l Petroleum Refiners Ass'n*, 482 F.2d at 693, 695 (citing 27 Fed. Reg. 4636, 4796 (1962)).  In the five decades following the Magnuson-Moss Warranty Act, which gave the Commission explicit

authority to promulgate substantive rules on "unfair or deceptive acts or practices," the Commission has not sought to issue a single substantive *competition* rule until now.

75.   Even if some textual ambiguity existed as to the Commission's competition rulemaking authority, the major questions doctrine would apply and confirm that the Commission lacks such authority.  The major questions doctrine counsels against "locat[ing a] newfound power in the vague language of an ancillary provision of [an] Act, one that was designed to function as a gap filler and had rarely been used in the preceding decades."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (citation omitted) (cleaned up).  That is precisely what the Commission has done here.

76.   For the foregoing reasons, the Commission's promulgation of the Non-Compete Rule is final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" because the Commission lacks statutory authority to issue legally binding, substantive regulations regarding "unfair methods of competition."  The Non-Compete Rule should be held unlawful and set aside.  *See* 5 U.S.C. §§ 702, 706.

## Count II
### *Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) (The Non-Compete Rule Exceeds the Commission's Authority Under the FTC Act)*

77.     Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1–66 above.

78.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

79.     The Non-Compete Rule's designation of virtually all non-compete agreements as "unfair methods of competition" is contrary to Section 5 and thus exceeds the Commission's authority under that provision.   The Commission's categorical ban contravenes established principles of statutory interpretation.

80.     *First,* even if the Commission had substantive competition rulemaking authority, it would not permit the Commission to issue the Non-Compete Rule because not all non-competes are "unfair methods of competition" in violation of Section 5.   Without a clear statement from Congress, the Commission has announced a broad ban that casts aside the long-standing tradition of state and federal courts adjudicating covenants not to compete on a case-by-case basis, assessing such agreements in light of the reasonableness of their duration, geographic scope, and propensity to harm competition in a particular market.  *See Snap-On Tools Corp.*, 321 F.2d at 837

(applying Section 5 of the FTC Act to hold that "[r]estrictive [non-compete] clauses . . . are legal unless they are unreasonable as to time or geographic scope"); *see also Eichorn*, 248 F.3d at 144 (in Sherman Act cases, "courts have uniformly found that covenants not to compete should be examined under the rule of reason").

81.   *Second,* just as the major questions doctrine counsels against interpreting the FTC Act to grant rulemaking authority to the Commission under Section 6(g), the doctrine also counsels against interpreting Section 5 to grant the Commission the authority to implement a one-size-fits-all ban of non-compete agreements.  The Commission asserts a novel, sweeping power in an area of great economic and political significance.  Congress did not speak clearly or directly in authorizing any such power.

82.   *Third,* the Commission's interpretation would seriously upset the balance of federal-state power in the absence of a clear statement from Congress.  As contractual agreements between companies and contractors or employees, non-compete agreements sit squarely within the core of traditional state regulatory authority.  Yet, the Commission reads the phrase "unfair methods of competition"—without more from Congress—to alter this long-standing balance of federal-state power significantly.  State law specifically permitted POV's non-competes, as this Court has held.  *See Kranz*, 2021 WL 2144178, at *5.  But the Non-Compete Rule would override both that ruling

and Florida's longstanding regulation of non-compete agreements without a clear directive from Congress.

83.    *Finally*, the canon of constitutional avoidance strongly counsels against the Commission's interpretation of the law.    "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."    *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 519 (D.C. Cir. 2003) (quoting Henry J. Friendly, Benchmarks 211-12 (1967)).    The Commission advances an interpretation of Section 5 that would render the statute unconstitutional for multiple reasons.    As discussed *infra* in Count IV, the Commission's interpretation would exceed federal power under the Commerce Clause as applied to POV.    As discussed *infra* in Count V, the Commission's interpretation would mean that Congress violated the nondelegation doctrine when it gave "unfair methods of competition" rulemaking authority to the Commission.    The Commission's interpretation also could raise Takings Clause concerns, given that it upsets an existing interest in a contractual right.    *See E. Enters. v. Apfel*, 524 U.S. 498, 533 (1998).

84.    Additionally, the Commission's interpretation would suggest that the Commission has sweeping rulemaking powers to regulate the American

economy—powers beyond what the Supreme Court understood the agency to have in *Humphrey's Executor*.    If the Commission is correct, then this interpretation of Sections 5 and 6(g) would call into question the ongoing vitality of the Court's holding in *Humphrey's Executor* and the removal protections that FTC Commissioners enjoy.    *Cf. Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 215 (2020) ("Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" (quoting *Humphrey's Executor*, 295 U.S. at 628)).

85.    For all these reasons, even if the Commission has substantive rulemaking authority, the FTC Act does not grant the Commission the authority to declare virtually all prospective non-compete agreements to be "unfair methods of competition" in violation of Section 5.    The Non-Compete Rule should be held unlawful and set aside.    *See* 5 U.S.C. §§ 702, 706.

## <u>Count III</u>
### *Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) (The Non-Compete Rule Is Impermissibly Retroactive)*

86.    Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1–66 above.

87.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

88.    The Non-Compete Rule frustrates the presumption against retroactivity.    The Non-Compete Rule operates retroactively—disrupting

settled arrangements and upending businesses' private rights.  For POV, the Non-Compete Rule could undo the previous ruling of this Court, which has already upheld the validity of the POV's non-compete agreements.  *See Kranz*, 2021 WL 2144178, at *5.

89.    "Retroactivity is not favored in the law" and "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Motion Picture Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1156-57 (D.C. Cir. 1992).  This principle ensures that an agency's actions do not upset settled arrangements without Congress clearly having conferred the authority to do so.

90.    The Commission itself has acknowledged that the Non-Compete Rule will retroactively invalidate tens of millions of contracts.  *See* 89 Fed. Reg. at 38343.  Indeed, the Non-Compete Rule, once effective, will render POV's existing non-compete agreements with current and former Sales Associates instantly unlawful and unenforceable, even though POV has already compensated its Sales Associates for such agreements through money, training, and access to confidential information.  The Non-Compete Rule invalidates agreements for which POV has already performed its side of the bargain.

91.     The FTC Act does not confer authority to impose retroactive regulations.  As explained above, the FTC Act provides limited rulemaking authority to the Commission.  Those provisions do not mention, much less clearly state, that such authority shall be retroactive.

92.     The Non-Compete Rule's significant retroactive impact on POV's pre-existing agreements thus exceeds the Commission's statutory authority. The Non-Compete Rule should be held unlawful and set aside. *See* 5 U.S.C. §§ 702, 706.

## Count IV
### *Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), and the U.S. Constitution (The Non-Compete Rule Violates the Commerce Clause)*

93.     Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1–66 above.

94.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

95.     If the FTC Act is interpreted to grant the Commission the authority it seeks to ban non-compete agreements regardless of their scope, that would violate the Commerce Clause as applied to POV.

96.     Congress's power under the Constitution extends only to the regulation of domestic commerce "among the several States."  U.S. Const. art.

I, § 8.  Thus, Congress—and, by extension, the federal agencies that Congress establishes—does not have power to regulate purely intrastate commerce.

97.    The commerce at issue here is purely intrastate, and Congress's regulatory authority under the Constitution does not extend to intrastate commerce.  As applied to POV, the FTC Act's proscription of "unfair methods of competition" is unconstitutional to the extent it condemns the company's intrastate non-compete agreements as illegal.  The POV non-compete agreements relate only to the professional services of selling of homes in The Villages, a community comprising less than one-tenth of one percent of the land in Florida.  Former Sales Associates remain free to participate in the interstate labor market; they must only refrain from selling homes in a limited geographic region in Florida for a competitor of POV for 24 months.

98.    Through the Non-Compete Rule, the Commission asserts a power to regulate a purely intrastate labor market involving the sale of homes within The Villages community.  Moreover, homes are inherently localized products that do not move from state to state.

99.    To read the FTC Act to apply to POV's purely intrastate activity is inconsistent with the Commerce Clause.  The Rule therefore is unconstitutional as applied to POV and should be set aside. *See* 5 U.S.C. §§ 702, 706.

<u>Count V</u>
*Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), and the U.S. Constitution (The Non-Compete Clause Violates the Non-Delegation Doctrine)*

100.   Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1–66 above.

101.   The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

102.   If the FTC Act were to permit the Commission to promulgate the Non-Compete Rule, it would amount to a delegation of legislative authority that violates the separation of powers.

103.   The U.S. Constitution vests "[a]ll legislative Powers" in Congress. Art. I, § 1. Under the nondelegation doctrine, "Congress … may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *Wayman v. Southard*, 23 U.S. 1, 42–43 (1825)).

104.   A statutory delegation of authority to an agency is constitutional only if Congress provides an "intelligible principle" to cabin the agency's discretion. *Gundy*, 588 U.S. at 135 (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). "Whether the statute delegates

legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer." *Whitman*, 531 U.S. at 473.

105.   According to the Commission's Section 5 Policy Statement, the Commission has exceedingly broad authority to declare all kinds of business activities "unfair methods of competition" and therefore illegal.   If the Commission can rely on "unfair methods of competition" to ban all non-compete agreements regardless of their reasonableness or actual effect on competition, then that language in Section 5 fails to provide a principle that is intelligible enough to guide the agency's discretion.   *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537–38 (1935) (Congress may not delegate "unfettered discretion to make whatever laws [an agency] thinks may be needed or advisable").

106.   Therefore, even assuming that Congress granted the Commission statutory authority to promulgate the Non-Compete Rule, doing so amounts to an unconstitutional delegation of legislative power that violates the separation of powers.   The Non-Compete Rule should be held unlawful and set aside.   *See* 5 U.S.C. §§ 702, 706.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court issue judgment in its favor and against Defendant and grant the following relief:

44

A.      Issue an order vacating and setting aside the Non-Compete Rule in its entirety pursuant to the Administrative Procedure Act, *see* 5 U.S.C. § 706(2);

B.      Declare that the Commission lacks substantive rulemaking authority over unfair methods of competition;

C.      Declare that the Commission exceeded its statutory authority under the FTC Act by promulgating the Non-Compete Rule;

D.      Declare that the Non-Compete Rule is impermissibly retroactive;

E.      Declare that the Non-Compete Rule violates the Commerce Clause as applied to POV;

F.      Declare that the Non-Compete Rule violates the nondelegation doctrine;

G.      Enjoin Defendant from enforcing the Non-Compete Rule against POV;

H.      Issue an order staying the effective date and implementation of the Non-Compete Rule against POV pending conclusion of this case;

I.      Issue an order awarding POV its reasonable costs, including attorneys' fees, incurred in bringing this action; and

J.      Grant any other relief as the Court deems just and equitable.

Respectfully submitted,

June 21, 2024

_s/Patrick M. Muldowney_
Patrick M. Muldowney
  Florida Bar No. 0978396
Meagan L. Martin
  Florida Bar No. 89657
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, FL 32801
(407) 649-4000
pmuldowney@bakerlaw.com
mmartin@bakerlaw.com

Stacey K. Grigsby (_pro hac vice_
  application forthcoming)
Lauren Willard Zehmer (_pro hac vice_
  application forthcoming)
Matthew J. Glover (_pro hac vice_
  application forthcoming)
Emily Vernon (_pro hac vice_
  application forthcoming)
Eli Nachmany (_pro hac vice_
  application forthcoming)
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sgrigsby@cov.com
lzehmer@cov.com
mglover@cov.com
evernon@cov.com
enachmany@cov.com

_Counsel for Plaintiff_