## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

PROPERTIES OF THE VILLAGES, INC.,

     *Plaintiff*,

v.

FEDERAL TRADE COMMISSION,

     *Defendant*.

Case No. 5:24-cv-000316-TJC-PRL

## PLAINTIFF'S MOTION FOR STAY OF EFFECTIVE DATE AND PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 65 and Local Rules 6.01 and 6.02, Plaintiff Properties of the Villages, Inc. ("POV") moves for a stay of effective date and preliminary injunction against Defendant Federal Trade Commission ("FTC").

## INTRODUCTION

Just a few years ago, this Court held that POV's noncompete agreements were valid and enforceable under Florida law. Like the vast majority of States, Florida has long permitted reasonable noncompete agreements that encourage businesses to invest in their workforces through training, as well as access to proprietary information and client relationships, without the risk that those

individuals will immediately divert those investments to a competitor. The FTC, however, recently issued a blanket ban invalidating nearly all existing and future noncompete agreements—including POV's—as "unfair methods of competition" under its Non-Compete Clause Rule ("Rule"), 89 Fed. Reg. 38342 (May 7, 2024).

The magnitude of the Rule cannot be overstated. The FTC itself projects that the Rule will invalidate 30 million existing contracts, *id.* at 38343, even where a business has already performed its end of the bargain. The Rule preempts laws in 46 States, casting aside local policy judgments that noncompete agreements can benefit both employers and workers. The FTC's one-size-fits-all approach also departs from longstanding state and federal precedent, under which courts assess noncompete agreements on a case-by-case basis in light of their reasonableness.

Consistent with that tradition, this Court has upheld POV's noncompete agreements under Florida law. *See Props. of the Villages, Inc. v. Kranz*, No. 5:19-CV-647-JSM-PRL, 2021 WL 2144178, at *5 (M.D. Fla. May 24, 2021). Following substantial briefing and a full trial, this Court held that POV's noncompete agreements were "valid and enforceable" as both "reasonable in time, area, and line of business" and justified to protect POV's customers; goodwill; training program; and confidential, proprietary and trade secret

information. *Id*. The FTC's Rule now seeks to effectively invalidate this Court's opinion along with millions of other bargained-for contractual arrangements.

The statutory authority on which the FTC relies is as thin as the Rule is broad. While Congress authorized the FTC to issue substantive rules with respect to unfair and deceptive trade practices, it gave the FTC no authority to issue substantive *competition* rules. Rather, the FTC combines an ancillary, housekeeping provision on procedural rules from Section 6 of the 1914 Federal Trade Commission Act ("FTC Act") with its separate, adjudicatory powers under Section 5. Such an interpretation, however, would give the FTC unfettered power to regulate wide swaths of the U.S. economy. It is implausible that Congress hid this elephant-sized rulemaking authority in the unassuming mousehole of Section 6(g).

Even if the FTC could issue binding rules regarding unfair methods of competition, it would still lack the authority to retroactively invalidate an entire class of contractual arrangements that have long been governed by and upheld under state law. Further, nothing in Section 6(g) permits a departure from Section 5's requirement that the FTC adjudicate whether a noncompete agreement is an unfair method of competition on a case-by-case basis, subject to judicial review.

Traditional tools of statutory interpretation make clear that the FTC lacks the authority to issue the Rule. But if any doubt remains, the major

questions doctrine and the canon of constitutional avoidance further counsel against the FTC's interpretation. Whether the FTC has authority to issue the Rule is undeniably a major question, involving an assertion of novel, sweeping power in an area of great economic and political significance. Applying the Rule to POV's purely intrastate labor agreements raises serious constitutional concerns, including under the Commerce Clause and the non-delegation doctrine. In these circumstances, the FTC Act should be construed to avoid these constitutional infirmities.

As explained below, POV is likely to succeed on the merits that the FTC lacks the authority to issue the Rule; POV will be irreparably harmed; and the balance of the equities and the public interest weigh in favor of the narrow preliminary injunction sought. This Court should stay the Rule's effective date and preliminarily enjoin the FTC from enforcing the Rule against POV pending resolution of this legal challenge.

## BACKGROUND

## I.   POV's Business And Need For Noncompete Agreements

POV sells homes in The Villages® ("The Villages"), an active adult community encompassing approximately 58,000 acres in parts of Lake, Sumter, and Marion Counties, Florida. Declaration of Jennifer Parr ("Parr Decl.") ¶¶ 1, 24 (filed herewith as **Exhibit "1"**). Since its founding in the 1980s, The Villages has grown from a mobile home park with access to free golf to a

community of over 145,000 "Villagers," due in large part to the hospitality mindset of its founders Gary and Sharon Morse. *Id.* ¶ 6. POV focuses on creating enduring relationships with customers that may last decades or generations. Because of the reputation POV has built, both new and returning customers frequently turn to POV and its sales team—rather than third-party real estate brokers—when looking to buy or sell property in The Villages. *Id.* ¶¶ 15,17.

POV contracts with real estate sales associates ("Sales Associates") who work exclusively in The Villages and are often hired with little to no prior real estate experience. *Id.* ¶ 9. POV provides Sales Associates with an intensive three-month training course that covers every element of POV's business—including The Villages' history and culture, including neighborhoods, amenities, and lifestyle opportunities. *Id.* ¶¶ 8-12. To enable new Sales Associates to participate in this training full time, POV pays them a stipend in the form of an advance on future commissions. *Id.* ¶ 9.

Rather than having to knock on doors to generate business, POV's Sales Associates also benefit from a steady stream of prospective clients based on POV's brand, goodwill, and efforts to attract potential residents, allowing Sales Associates to focus on serving customers. *Id.* ¶¶ 15-18. For example, hundreds of thousands of people visit The Villages' website each month, and clients reach out to POV through website inquiries, call centers, and walk-ins. *Id.* ¶ 16.

5

POV's Lifestyle Preview Plan lets prospective clients sample The Villages lifestyle by staying at a home in the community for up to a week. *Id.* ¶ 18. POV shares these prospective clients with its Sales Associates. Access to POV's customer base is particularly valuable because Villagers often relocate within The Villages multiple times, and Villagers and their families may turn to the same POV Sales Associate for future sales. *Id.* ¶ 15.

In exchange for these benefits, all Sales Associates agree to abide by limited noncompete agreements. *Id.* ¶ 20. A "noncompete" is often a clause in a broader contract and in which an individual agrees not to work for a business's competitors (or otherwise to compete with that business) in exchange for gaining access to a business's specialized training, client base, trade secrets, and other proprietary information. In POV's case, these noncompete agreements require Sales Associates to refrain from acting as real estate representatives within The Villages community for 24 months after their engagement with POV ends. *Id.* ¶¶ 21-22. Notably, Sales Associates may not work as real estate representatives *only* "within the geographic area known as The Villages community as it exists at the time of termination of Salesperson's engagement." *Id.* ¶¶ 21, 23 (map depicting current boundaries of The Villages). Sales Associates remain free to sell real estate anywhere else in the State and may resume selling in The Villages after a short cooling off period. *Id.* ¶ 24.

This Court recently upheld POV's limited noncompete agreements as reasonable. *Kranz*, 2021 WL 2144178, at *5. In December 2019, within days of terminating their contracts with POV, two former Sales Associates formed their own real estate brokerage. *Id.* at *2. They immediately began inviting current POV Sales Associates to join their company and soliciting POV's customers. *Id.* POV sued to hold its former Sales Associates to their agreements. Following a bench trial, this Court upheld the enforceability of POV's noncompete agreements under Florida law as "reasonable in time, area, and line of business" and justified to protect POV's legitimate business interests in its customers; goodwill; and confidential, proprietary, and trade secret information. *Id.* at *5 (citing Fla. Stat. § 542.335(1)).

As the *Kranz* litigation demonstrates, noncompete agreements have traditionally been regulated at the state level and assessed on a case-by-case basis. Florida, like most States, recognizes that reasonable noncompete agreements can and do benefit workers and businesses alike. As of May 2024, 46 States and the District of Columbia allow at least some types of noncompete agreements under state law. *See State Noncompete Law Tracker*, Econ. Innovation Grp. (May 22, 2024).[1] In States that permit them, noncompete

---

[1] https://eig.org/state-noncompete-map/.

agreements must typically be limited in time, geography, and line of commerce. *See, e.g.*, Fla. Stat. § 542.335(1).

Notwithstanding this tradition of States taking nuanced and tailored approaches to the regulation of noncompete agreements, the FTC recently issued a rule categorically banning noncompetes regardless of their individual scope, legitimate business justifications, or competitive effects.

## II.  The Commission's Authority Under The FTC Act

The FTC asserts that its authority to ban nearly all noncompete agreements arises from its organic statute, the Federal Trade Commission Act of 1914, and its amendments. *See* 15 U.S.C. §§ 41 *et seq.*

Pursuant to a compromise between the House and the Senate, the FTC was given both enforcement and investigative functions, housed in separate sections of the Act. *See* Thomas W. Merrill & Kathryn T. Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 505 (2002). The FTC's enforcement powers are found in Section 5 of the Act, which "empower[s]" the agency to "prevent" the use of "unfair methods of competition in or affecting commerce." 15 U.S.C § 45(a)(2); *see also id.* § 44 (defining "Commerce" to mean "commerce among the several States or with foreign nations"). From its inception, the FTC has enforced the Act's prohibition on unfair methods of competition through case-by-case adjudication. *See, e.g.*,

8

*AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 71–72 (2021).[2] In 1938, Congress added the prevention of "unfair or deceptive acts or practices" to the Commission's Section 5 mandate. An Act to Amend the FTC Act, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111 (1938).

Section 6 of the Act describes "[a]dditional powers" of the FTC that generally relate to its investigative authority. 15 U.S.C. § 46. Distinct and separate from its enforcement power, the FTC is charged with investigating certain industries and issues and monitoring compliance with consent decrees and antitrust laws. *See id.* § 46(a)–(d), (h)–(j). Section 6 also discusses publishing reports, *id.* § 46(f), and referring evidence of criminal conduct to the U.S. Attorney General. *Id.* § 46(k). Tucked away within a miscellaneous subpart of Section 6, under the header "Classification of corporations; regulations," Section 6(g) provides that the FTC shall have the power to "classify corporations" and "to make rules and regulations for the purpose of carrying out the provisions of this subchapter." *Id.* § 46(g).

Aside from brief experimentation with consumer protection rulemaking in the 1960s and 1970s, the FTC has not previously invoked Section 6(g) to issue substantive rules proscribing "unfair methods of competition." *See*

---

[2] As Representative Harry Covington—who chaired the House subcommittee that drafted the first iteration of the FTC Act—remarked about the final bill, "[t]he Federal trade commission will have no power to prescribe the methods of competition to be used in [the] future," explaining that the agency would instead "exercise power of a judicial nature" in individual cases. 51 Cong. Rec. 14932 (Sept. 10, 1914).

Maureen Ohlhausen & Ben Rossen, *Dead End Road:* National Petroleum Refiners Association *and FTC 'Unfair Methods of Competition' Rulemaking*, Truth on the Market (July 13, 2022).[3] The FTC "did not assert the power to promulgate substantive rules" of *any* kind "until 1962 and indeed indicated intermittently before that time that it lacked such power." *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973).

In 1975, Congress passed the Magnuson-Moss Warranty Act, which expressly authorized the FTC to issue rules proscribing unfair and deceptive acts and practices ("UDAPs"). Pub. L. No. 93-637, § 202, 88 Stat. 2183, 2193–96 (codified at 15 U.S.C. § 57a). Tellingly, however, that Act did not authorize substantive rulemaking authority for unfair methods of *competition*.

## III.   The Non-Compete Clause Rule

In January 2023, the FTC proposed a nationwide ban on virtually all noncompete agreements. Non-Compete Clause Rule, 88 Fed. Reg. 3482 (Jan. 19, 2023). As Commissioner Wilson noted in a vigorous dissent, the Proposed Rule marked a "radical departure from hundreds of years of legal precedent" and would be "vulnerable to meritorious challenges." 88 Fed. Reg. at 3540.

On April 23, 2024, by a 3–2 vote, the FTC announced the Final Rule, which bans nearly all noncompete agreements nationwide, regardless of an

---

[3] https://perma.cc/KX5R-H4B3.

individual agreement's effect on competition or legitimate business justifications. 89 Fed. Reg. 38342, 38502–38503. Specifically, the Rule declares that "it is an unfair method of competition" to "enter into or attempt to enter into a non-compete clause," "enforce or attempt to enforce a non-compete clause," or "represent that [a] worker is subject to a non-compete clause." *Id.* Once the Rule takes effect on September 4, 2024, it will prospectively ban virtually all new "worker" noncompete agreements. *See* 16 C.F.R. § 910.2(a), 89 Fed. Reg. at 38502–38503. The Rule will also *retroactively* void virtually all existing noncompetes, including those that provided compensation in exchange for such provisions and those that are legal under existing law.[4]

## **LEGAL STANDARD**

To obtain a stay of the Rule's effective date and a preliminary injunction against the FTC, POV must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017).

---

[4] The Rule's retroactive ban includes a narrow carve-out for "senior executives" in "policy-making" positions, which is not applicable to POV Sales Associates, and also permits enforcement of noncompete agreements where the cause of action accrued before the effective date of the Rule. *See* 16 C.F.R. § 910.1(2) and 910.3, 89 Fed. Reg. at 38502.

This case arises under the Administrative Procedure Act ("APA"), which provides that a court "shall hold unlawful and set aside agency action" that is, among other things, "not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(A)-(C). In an APA action, this Court may review any issue that the agency considered during its rulemaking, *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1084 (D.C. Cir. 1996). It is undisputed that the FTC is an "agency" under the APA, 5 U.S.C. § 551(1), and the Rule constitutes a final, reviewable, "agency action," *id.* § 551(13).

## **ARGUMENT**

## I.    **POV Is Likely To Succeed On The Merits.**

### A.    **The FTC Lacks Substantive Competition Rulemaking Authority Under The FTC Act.**

For its asserted authority to issue the Rule, the FTC takes two unrelated provisions from separate sections of the FTC Act and reads them together to create a novel, expansive authority to regulate entire categories of agreements as "unfair methods of competition" without any individualized showing of actual or potential anticompetitive harm. But nothing in Section 6(g) or Section 5—whether read independently or together—grants the FTC this breathtaking authority. Section 6(g) merely grants the FTC authority to "classify corporations" and to make *procedural* "rules and regulations for the purpose of

carrying out the provisions of this subchapter." 15 U.S.C. § 46(g). Congress has not directed the FTC to use this narrow rulemaking provision to carry out its separate enforcement authority to prevent "unfair methods of competition" under Section 5. *Id*. § 45(a)(1). Because the text, structure, and history of the FTC Act all confirm that Section 6(g) does not confer the authority to issue competition rules with the force of law, POV is likely to prevail on the merits.

 ***Text.*** The Commission maintains that the phrase "to make rules and regulations for the purpose of carrying out the provisions of this subchapter" grants it substantive rulemaking authority for "unfair methods of competition" under Section 5. *Id*. § 46(g). The more natural reading, however, is a narrower one. The provision in its entirety states that the FTC has the power to, "[f]rom time to time classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter." *Id.* As "classify[ing] corporations" is procedural or interpretive, the canon of *noscitur a sociis* instructs that other "rules and regulations" in Section 6(g) would be similarly procedural or interpretive. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."). Section 6(g)'s neighboring provisions likewise confirm its modest scope. *See, e.g.*, 15 U.S.C § 46(f) (power to make reports to Congress). It is also not plausible that Congress would have dramatically expanded the FTC's Section

5 enforcement authority through this tucked-away provision of Section 6. Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details" of an agency's regulatory authority in "ancillary provisions" like Section 6(g). *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

**Structure.** Sections 5 and 6 address fundamentally different powers of the FTC. Section 5 confers authority to conduct adjudications, 15 U.S.C. § 45, while Section 6 addresses investigatory powers and reporting to Congress. *Id.* § 46. The FTC's interpretation of Section 6(g) would render its rulemaking authority far more powerful than its enforcement authority under Section 5, even though Section 6 mentions rulemaking in a single sentence, while Section 5 devotes fourteen subsections to precisely defining and circumscribing the agency's adjudicatory powers. *See, e.g.*, *AMG*, 593 U.S. at 78 (rejecting the FTC's attempt to improperly combine separate provisions of the FTC Act to create a new power).

Where Congress has provided the FTC with substantive rulemaking authority, it has done so explicitly—as in Section 18, which governs UDAP rulemaking. *See* 15 U.S.C. § 57a. Congress enacted no corresponding authorization for unfair methods of competition rulemaking. Nor has Congress imposed any of the heightened procedural requirements or penalty provisions

that accompany the FTC's substantive UDAP rulemaking authority. *See* 15 U.S.C. § 57a(b)–(c); 15 U.S.C. § 45(m)(1)(A).

Congress would not have needed to amend the FTC Act in 1975 if Section 6(g) already granted the FTC broad substantive rulemaking authority back in 1914. Simply put, if Congress understood Section 6(g) to grant the FTC the power to make substantive rules, Congress would not have needed to specifically amend the Act to permit rulemakings that address UDAP and other substantive areas. *See, e.g.*, 15 U.S.C. § 57a(a)(1) (UDAP); *see also, e.g.*, *id*. § 1194(c) ("The Commission is authorized and directed to prescribe" rules regarding flammable fabrics); *id*. § 45(a) (allowing the Commission to issue rules for Made in America labeling). Adopting the FTC's proposed interpretation would render these sections superfluous in light of Section 6(g).

Nor does the Magnuson-Moss Act's savings clause provide the FTC with competition rulemaking authority. *See* 15 U.S.C. § 57a(a)(2). That provision merely states that the UDAP amendment "shall not affect *any* authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce." *Id*. (emphasis added). By specifying that the Act leaves undisturbed "any" authority—rather than "the" authority—Congress did not convey new substantive rulemaking authority; Congress simply preserved the

15

status quo with respect to procedural competition rulemaking.[5] *See AMG,* 593 U.S. at 80–81 (rejecting similar savings clause argument by FTC).

***History.*** For nearly 50 years after enactment of the FTC Act, the Commission did not assert *any* substantive rulemaking authority under Section 6(g). *See Nat'l Petroleum Refiners Ass'n*, 482 F.2d at 686 (citing 27 Fed. Reg. 4636, 4796 (May 19, 1962)). Although the D.C. Circuit held that Section 6(g) grants the FTC substantive rulemaking authority, that non-binding decision rests on dubious textual analysis that the Supreme Court's recent precedent has called into significant doubt. The Supreme Court has confirmed that courts cannot infer rulemaking authority from the fact that Congress did not *preclude* such authority but must consider "whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *see also NFIB v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) (administrative agencies "possess only the authority that Congress has provided."); *see also* Dissenting Statement of Comm'r Holyoak, *In re Non-Compete Clause Rule* at 14–15 (June 28, 2024), https://perma.cc/8Q78-GAXH.

Notably, the FTC has not relied on Section 6(g) to issue a substantive *competition* rule in the five decades since the Magnuson-Moss Warranty Act.

---

[5] Congress was also aware of the Merger Guidelines, which the FTC and Justice Department had recently issued in 1968, and "thought it was important to provide that they were not affected." Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit*, 75 Admin. L. Rev. 277, 307 (2023). In contrast to the Rule, the Merger Guidelines do not carry the force of law.

It strains credulity that the FTC had this immense power but declined to exercise it for 50 years. *See Fed. Power Comm'n v. Panhandle E. Pipe Line Co.*, 337 U.S. 498, 513 (1949) ("Failure to use such an important power for so long a time indicates . . . that the Commission did not believe the power existed."). Finally, if any ambiguity remained as to the FTC's competition rulemaking authority, the major questions doctrine would counsel against such a conclusion. *See infra* Part I.B.4.

## B.   The FTC Lacks Statutory Authority To Issue This Rule.

Even if the FTC has the authority to promulgate substantive competition rules, POV is likely to prevail in its argument that the Commission exceeded that authority by categorically banning existing and future noncompete agreements as "unfair methods of competition."

### 1.   *Not All Noncompetes Are "Unfair Methods of Competition."*

The FTC exceeds its statutory authority and disregards decades of precedent by asserting that it may unilaterally deem an entire class of long-standing vertical business arrangements *per se* illegal. Neither Section 5 nor Section 6(g) permits such a sweeping rewrite of antitrust jurisprudence.

Courts applying the Sherman Act "have uniformly found that covenants not to compete should be examined under the rule of reason." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001); *see also Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1560–61 (11th Cir. 1983) (following

"an unbroken line of cases holding that the validity of covenants not to compete under the Sherman Act must be analyzed under the rule of reason"). Under that standard, courts must "examine the effect of [a] defendant['s] agreement within the wider context of its competitive purposes and its impact on the relevant product and geographic markets." *Eichorn*, 248 F.3d at 144. Such assessments cannot be made in the aggregate. Rather, applying the rule of reason requires "weigh[ing] all of the circumstances of a case," including "specific information about the relevant business." *Leegin Creative Leather Prods., Inc. v. PSKs, Inc.*, 551 U.S. 877, 885 (2007).

Categorically invalidating noncompete agreements as effectively *per se* illegal under Section 5 cannot be reconciled with this Sherman Act precedent. Both the FTC and the courts routinely rely on Sherman Act jurisprudence to assess whether a challenged practice is an "unfair method of competition" under Section 5. *See, e.g., 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 117 (2d Cir. 2021) (applying Sherman Act case to vacate FTC's "unfair method of competition" determination); *Boise Cascade Corp. v. FTC*, 637 F.2d 573, 581–82 (9th Cir. 1980) (same). And courts have repeatedly applied Sherman Act case law to hold that the FTC may not unilaterally declare restraints to be *per se* violations under Section 5 if they are otherwise subject to rule-of-reason treatment. *See, e.g., 1-800 Contacts*, 1 F.4th at 117 (holding that when a type of restraint "has not been widely condemned in our judicial experience, more

[than per se treatment] is required" under Section 5 (citation omitted)); *E.I. duPont de Nemours & Co. v. FTC*, 729 F.2d 128, 141–42 (2d Cir. 1984) (vacating Commission's finding of a Section 5 violation due to lack of evidence of anticompetitive effects).

The only time the FTC fully litigated a Section 5 challenge to a noncompete agreement, the Seventh Circuit vacated the FTC's cease-and-desist order based on its failure to prove anticompetitive effects. *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 836–37 (7th Cir. 1963). If the Seventh Circuit was "not prepared to say" that the noncompete clause at issue was "a *per se* violation" of Section 5 based on a fully developed record, then the FTC's attempt to deem nearly *all* noncompete clauses illegal necessarily exceeds Section 5's limits. *Id*. at 837. It cannot be the case that because the Commission now seeks to invalidate nearly all noncompetes through rulemaking, the FTC has *more* leeway to presume noncompetes unlawful than it does when challenging specific agreements on a fully developed record.

Such an argument is also contrary to a long line of cases holding that the Commission was entrusted with authority that exceeds the reach of other antitrust statutes precisely *because* the Commission is restricted to interpreting Section 5 through case-by-case adjudication. As the Supreme Court explained, "the expression 'unfair methods of competition'" in the 1914 Act was "new in the law," and "to be determined in particular instances, upon

evidence, in the light of particular competitive conditions." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 533 (1935); *see also Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296, 306–08 (1963) (explaining that the words "unfair methods of competition . . . take their meaning from the facts of each case").

Applying the Rule to POV illustrates the extent of the FTC's overreach. The FTC acknowledges that "some hypothetical set of non-competes may not constitute unfair methods of competition," and that a court could invalidate the Rule as to those exceptions. Fed. Trade Comm'n Response to Motion to Stay Effective Date and for Preliminary Injunction at 26 n.5, *Ryan LLC v. FTC*, No. 3:24-cv-986 (N.D. Tex. May 29, 2024), ECF No. 82 (citing *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020)). Here, the FTC has not proven that POV's noncompete agreements are "unfair methods of competition" under Section 5. To the contrary, a federal court has already found that these agreements are narrowly tailored and supported by legitimate business justifications. *See Kranz*, 2021 WL 2144178, at *5. The FTC has made no showing of any prospective or actual anticompetitive effects that would render POV's agreements nonetheless unlawful under Section 5.

By invalidating POV's agreements under its 6(g) rulemaking authority, the FTC has improperly sidestepped Section 5's requirement to assess

potentially procompetitive noncompete agreements based on their individual facts and subject to judicial oversight by an Article III court.

    2.    *The Rule Intrudes In A Core Domain Of State Regulation Without Congressional Authorization.*

Not only does the Rule invalidate POV's agreements without regard to their individual facts, it also preempts Florida's noncompete statute that expressly permits reasonable noncompete agreements, like POV's. The Rule displaces the judgment of Florida—and 45 other States—in an area traditionally governed by state law despite any clear authority to do so. Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 679 (2023). And the presumption that Congress did not intend to "alter[] the federal-state framework" is "heightened" when a federal agency interprets statutory language. *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001); *see also ABA v. FTC*, 430 F.3d 457, 471–72 (D.C. Cir. 2005) (invalidating FTC's attempt to regulate the practice of law as an area traditionally left to the States); Dissenting Statement of Comm'r Ferguson, *In re Non-Compete Clause Rule* at 3–4 (June 28, 2024).[6]

Here, Congress did not clearly authorize the FTC to intrude into this core area of traditional state regulation. The States have developed their own legal

---

[6] https://perma.cc/8Q78-GAXH.

frameworks, by statute or common law, for evaluating the legality of noncompete agreements. The Rule disrupts this longstanding balance of federal-state power based on a strained reinterpretation of a 110-year-old statute.

Following the federalism canon—as well the major questions doctrine discussed *infra*—the FTC's interpretation of its Section 5 authority should not be read to upset the existing state regulatory frameworks absent a clear statement from Congress.

### 3.   The Rule Impermissibly Invalidates Existing Contracts Retroactively.

Even if the FTC had the power to forbid employers from entering into noncompete agreements in the future, it still would not have the power to invalidate *existing* noncompete agreements. A "statutory grant of legislative rulemaking authority will not . . . be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

Neither Section 5 nor Section 6(g) of the FTC Act so much as hint that Congress granted the FTC power to promulgate rules with retroactive effect, let alone provide an "express statutory grant." *Id.* at 209. The FTC thus lacks authority to void valid, preexisting noncompete agreements like POV's. *See Kranz*, 2021 WL 2144178, at *4–5. Here, POV bargained for noncompete

22

agreements by offering increased pay; extraordinary training; and access to POV's goodwill, customers, and confidential information in exchange. POV has already performed its end of the bargain with current Sales Associates, as well as those who have recently departed and remain within the noncompete period. Allowing the Rule to interfere with those contracts retroactively would present significant "problems of unfairness" by "depriv[ing] citizens of legitimate expectations and upset[ing] settled transactions." *E. Enters. v. Apfel*, 524 U.S. 498, 533 (1998) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992)). The Rule's retroactive reach would "affect[] contractual or property rights, matters in which predictability and stability are of prime importance." *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 271 (1994).

4.   *The Major Questions Doctrine Confirms That The FTC May Not Prohibit All Noncompetes Under Section 5.*

Any remaining doubt as to whether the FTC has the authority to issue its Rule is resolved by the major questions doctrine, which requires Congress to "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia*, 597 U.S. at 716. The Rule is of extraordinary economic significance. By the Commission's own estimates, it will render approximately 30 million contracts unenforceable, affect one in five American workers, and have an economic impact in the hundreds of billions of dollars. 89 Fed. Reg. at 38343, 38467.

Likewise, whether noncompete agreements should be deemed unlawful has been the subject of extensive political attention. Every State has spoken to the issue, either through explicit legislation or a body of common law, and members of Congress have recently introduced bills specifically addressing noncompete clauses. An agency may not "intrude[] into an area that is the particular domain of state law" absent a clear statement of Congress. *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (citation omitted). Nothing in the FTC Act suggests that Congress meant to permit the agency to wade into this contested and consequential issue, and the Act certainly does not contain the "exceedingly clear language" required to authorize the FTC to end that important national debate. *Id*.

The Rule also violates the major questions doctrine because the FTC has "claimed to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority." *West Virginia*, 597 U.S. at 724. As explained above, the FTC has "located [a] newfound power in the vague language of an ancillary provision" of its statute and relied on it "to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself"; as a result, "there is every reason to hesitate before concluding that Congress meant to confer on [the FTC] the authority it claims." *Id*. at 724–25.

### C.   The FTC's Interpretation Raises Serious Constitutional Concerns, Including Under The Commerce Clause.

As explained above, the FTC lacks authority to issue the Rule under a plain reading of the FTC Act. But even if the statute were ambiguous, the FTC's interpretation would raise significant constitutional concerns that, at a minimum, justify a preliminary injunction pending resolution on the merits.

As applied to POV, the Commission's interpretation of the FTC Act violates the Commerce Clause. Congress's power to regulate domestic commerce extends only to commerce "among the several states." U.S. Const. art. I, § 8. But the Rule regulates a purely intrastate labor market: real estate representatives who sell homes in The Villages.

The Supreme Court has explained that Congress may regulate only "those activities that *substantially* affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 557, 559 (1995) (emphasis added). When Congress regulates a labor market, courts have required a connection to the shipment of goods in interstate commerce. *See, e.g.*, *United States v. Darby*, 312 U.S. 100, 118–23 (1941); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37–38 (1937); *see also Lenca v. Laran Enterprises, Inc.*, 388 F. Supp. 782, 784–85 (N.D. Ill. 1974) (concluding that a "janitor's work does not substantially affect interstate commerce," notwithstanding the "use of the telephone in speaking

with prospective tenants from out of state," given that janitors "are simply not engaged in 'production of goods for commerce'").

Certainly, the Supreme Court at times has adopted an expansive interpretation of the Commerce Clause. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1 (2005); *Wickard v. Filburn*, 317 U.S. 111 (1942). Those cases, however, did not address an intrastate labor market for selling goods that are inherently stationary and non-fungible, like the homes in The Villages community. POV's noncompete agreements only temporarily restrict former Sales Associates from selling homes within a small area in central Florida, and Sales Associates remain free to sell homes anywhere else. Nor can the homes in The Villages be shipped in the interstate market. *See, e.g.*, *Darby*, 312 U.S. at 118–23. POV's noncompete agreements therefore fall outside the limit of what Congress has the authority to regulate under the Commerce Clause.[7]

Even if Congress has authority itself to regulate purely intrastate noncompete agreements, it did not clearly delegate that authority to the FTC.

---

[7] Ordinary rational basis review does not apply to Commerce Clause cases involving antitrust law. Whether conduct is anticompetitive depends on the individual facts of particular cases; for that reason, courts must determine "*in the first instance* whether the facts permit the exercise of power under the commerce clause," rather than merely reviewing a judgment of Congress. *Rasmussen v. Am. Dairy Ass'n*, 472 F.2d 517, 524 (9th Cir. 1972) (emphasis added); *see also Marston v. Ann Arbor Prop. Mgrs. Ass'n*, 302 F. Supp. 1276 (E.D. Mich. 1969) (concluding that real estate transactions in a college town were not interstate commerce, even though out-of-state students traveled to attend the university and rented apartments there). Thus, a "court may not stop with a determination that there would be a 'rational basis' for regulating the defendant's conduct." *Rasmussen*, 472 F.2d at 524.

Allowing the FTC to rely on Section 5's undefined "unfair methods of competition" to ban nearly all noncompete agreements would raise separate constitutional concerns under the separation of powers and the non-delegation doctrine. *See Schechter Poultry*, 295 U.S. at 537–38; *see also* Compl. ¶¶ 83-84.

This Court need not resolve such complex questions because "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). Granting a preliminary injunction would allow this Court to fully address these important issues on the merits before the Rule goes into effect.

## II.   POV Will Be Irreparably Harmed Without An Injunction.

Absent an injunction or stay, POV will suffer irreparable harm, including irreversible damage to its business and significant compliance costs. The Rule will invalidate POV's current noncompete agreements with Sales Associates and prevent POV from entering into such agreements in the future.

Even if POV prevails in this litigation, it will be unable "to recover monetary damages because of sovereign immunity," which "renders the harm suffered irreparable." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *see also Georgia v. President of the U.S.*, 46

F.4th 1283, 1302 (11th Cir. 2022) (holding that "unrecoverable costs of compliance constitute irreparable harm" for regulated entities).

POV will incur significant costs to comply with the Rule, even before the Rule goes into effect. Decl. ¶¶ 27-28. POV's noncompete agreements with Sales Associates will be unenforceable, even though POV has already compensated its Sales Associates for such agreements through in-depth training, access to sensitive proprietary information, and a pipeline of potential clients. *Id*. ¶ 29.

POV will need to identify all current and former Sales Associates who are subject to noncompete agreements, prepare notices addressed to those individuals, and send such notices. *Id*. ¶ 28. Completing this work will require a significant amount of time from POV's management staff. *Id*. POV has already retained counsel to review its employment agreements for compliance with the Rule and to issue notices to Sales Associates that their current noncompete agreements cannot be enforced. *Id*. Indeed, the Rule recognizes that employers like POV must incur such costs. 89 Fed. Reg. at 38483–38484.

The Rule will also require POV to expend considerable resources reviewing its core business model that is designed to provide extensive training, information, and support to Sales Associates, including confidential information like current and upcoming listings, and client contact information. Decl. ¶ 13. If the Rule goes into effect, POV will not be able to prevent current or former Sales Associates from joining competing brokerages, likely causing a

substantial and unrecoverable loss of expertise and customer relationships and resulting in the poaching of clients, listings, and other information and training materials. *Id.* ¶ 31. POV's entire training model would need to be redesigned to guard against Sales Associates taking the course with the intention of competing with POV. *Id.* This harm is not merely speculative, as the recent *Kranz* case demonstrates the concrete risk of Sales Associates taking their learnings from POV's comprehensive training, client relationships, and confidential information to competitors.

These substantial risks will force POV to reconsider its business model, including reevaluating the training and other benefits provided to Sales Associates. *Id.* ¶ 30. Specifically, POV will need to reduce the access that Sales Associates have to confidential information like current and upcoming listings and client data. POV's leadership also will have to dedicate significant time and financial resources to develop new protocols to protect proprietary information and deter Sales Associates from poaching clients and other Sales Associates. *Id.* ¶¶ 28-31.

These changes will substantially harm POV's operations and erode POV's reputation as a place where Sales Associates have close relationships with customers and a deep knowledge of The Villages. *Id.* ¶ 32. *See also BellSouth Telecomms., Inc. v. MCI Metro Access Trans. Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("loss of customers and goodwill" is irreparable harm).

## III.   The Balance Of The Equities And The Public Interest Support An Injunction.

The balance of equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435–36 (2009). Those factors also support an injunction because POV will suffer concrete harm to its business model and operations absent an injunction, while "neither the government nor the public has any legitimate interest in enforcing an unconstitutional ord[er]." *LaCroix v. Town of Fort Myers Beach, Fla.*, 38 F.4th 941, 955 (11th Cir. 2022). The FTC does not have a significant interest in the Rule taking effect before a court determines its legality.

An injunction will preserve the centuries-old status quo and allow POV to continue using noncompete agreements that this Court already upheld under Florida law. *Kranz*, 2021 WL 2144178, at *5. The FTC will not be harmed by waiting a few months for a decision on an authority it disclaimed for decades. Nor is the FTC harmed from waiting to enforce the Rule against noncompete agreements that this Court has already determined are consistent with public policy, narrowly tailored, and supported by legitimate business justifications. *See* Fla. Stat. § 542.335(1)(i).

## CONCLUSION

This Court should stay the effective date of the Rule and preliminarily enjoin the FTC from enforcing it against POV.

Respectfully submitted,

July 2, 2024

Patrick M. Muldowney
  Florida Bar No. 0978396
Meagan L. Martin
  Florida Bar No. 89657
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite
2300
Orlando, FL 32802
(407) 649-4000
pmuldowney@bakerlaw.com
mmartin@bakerlaw.com

___/s/ *Stacey K. Grigsby*_____
Stacey K. Grigsby (*pro hac vice*)
Lauren Willard Zehmer (*pro hac vice*)
Matthew J. Glover (*pro hac vice*)
Emily A. Vernon (*pro hac vice*)
Eli Nachmany (*pro hac vice*)
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
lzehmer@cov.com
sgrigsby@cov.com
mglover@cov.com
evernon@cov.com
enachmany@cov.com

*Counsel for Plaintiff*
*Properties of the Villages, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically filed on July 2, 2024, with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record. Moreover, on said date a copy of the foregoing was served via e-mail upon following counsel for the Federal Trade Commission:

Rachael Westmoreland - rachael.westmoreland@usdoj.gov
Arjun A. Mody - Arjun.A.Mody@usdoj.gov;
Taisa M. Goodnature - Taisa.M.Goodnature@usdoj.gov

/s/ *Stacey K. Grigsby*
Stacey K. Grigsby