## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

PROPERTIES OF THE VILLAGES,
INC.,

     Plaintiff,

v.                                       Case No. 5:24-cv-316-TJC-PRL

FEDERAL TRADE COMMISSION,

     Defendant.

_____

# P R E L I M I N A R Y   I N J U N C T I O N

Before the Court is Plaintiff's Motion for Stay of Effective Date and Preliminary Injunction. The Court conducted a hearing on August 13, 2024, the record of which is incorporated by reference. At the conclusion of the hearing, the Court announced its reasoning and decision on the record. The transcript of the Court's findings is attached to this Order. For the reasons stated therein,

It is hereby **ORDERED** that Plaintiff's Motion for Stay of Effective Date and Preliminary Injunction (Doc. 25) is **GRANTED** to the extent stated below.

It is further **ORDERED** that as of the date of this order, the Federal Trade Commission and its agents are **ENJOINED** from implementing or enforcing the Final Rule entitled "Non-Compete Clause Rule," 89 Fed. Reg.

38342 (May 7, 2024) against Plaintiff, Properties of the Villages, Inc., until further order of the Court.   No bond is required.

**DONE AND ORDERED** in Jacksonville, Florida this 15th day of August, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

Attachment

s.
Copies:
Counsel of record

```
              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
                     JACKSONVILLE DIVISION

PROPERTIES OF THE              Jacksonville, Florida
VILLAGES, INC.,
                               Case No. 5:24-cv-316-TJC-PRL
          Plaintiff,
                               August 14, 2024
  vs.
                               2:02 p.m.
FEDERAL TRADE
COMMISSION,                    Courtroom No. 10D

          Defendant.
_____
```

                    EXCERPT OF MOTION HEARING
           BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                 UNITED STATES DISTRICT JUDGE

 COURT REPORTER:

        Shannon M. Bishop, RDR, CRR, CRC
        300 North Hogan Street, Suite 9-150
        Jacksonville, Florida  32202
        Telephone:  (904)549-1307
        dsmabishop@yahoo.com


    (Proceedings recorded by mechanical stenography;
 transcript produced by computer.)

1                    A P P E A R A N C E S

2

3   PLAINTIFF'S COUNSEL:

4

5        **STACEY K. GRIGSBY, ESQ.**

6        **LAUREN WILLARD ZEHMER, ESQ**.

7        Covington & Burling

8        One City Center

9        850 Tenth Street, NW

10       Washington, DC  20001

11

12       **PATRICK M. MULDOWNEY, ESQ.**

13       **MEAGAN LEIGH MARTIN, ESQ.**

14       Baker & Hostetler, LLP

15       200 South Orange Avenue, Suite 2300

16       Orlando, FL  32801

17

18

19   DEFENDANT'S COUNSEL:

20

21       **RACHAEL WESTMORELAND, ESQ.**

22       DOJ-Civ

23       1100 L Street, NW

24       Washington, DC  20005

25

1          P R O C E E D I N G S

2     August 14, 2024                              2:02 p.m.

3                              *  *  *  *  *

4          (Recess from 3:55 p.m. to 4:05 p.m.; all parties present.)

5               COURT SECURITY OFFICER:  All rise.  This Honorable

6     Court is now in session.

7               Please be seated.

8               THE COURT:  So today I've heard argument on the

9     plaintiff Properties of the Villages, Inc.'s motion for stay of

10    effective date and preliminary injunction.

11               And in the interest of time, meaning that the rule

12    that is the subject of the motion is scheduled to take

13    effective three weeks, I think, from today, and in the interest

14    of giving the parties a quick answer, as opposed to waiting for

15    a written opinion, which as you all know takes substantially

16    longer, and given the compressed time frames that the Court was

17    dealing with in this case, I've decided to read my decision

18    from the bench.

19               What that means, of course, is that my decision,

20    which will be captured in the transcript, will not be as

21    polished or scholarly or complete as a published decision, but

22    it will give my reasoning and my decision so the parties can

23    make whatever further decisions are necessary before the final

24    rule is scheduled to take effect.

25               And I'll direct the parties to the transcript of the

1   hearing afterwards, and the court reporter can make those

2   arrangements, because they will capture the Court's ruling, and

3   also can be used for any appellate purposes.

4           And I will try to be deliberate in my reading.  I

5   know there are some members of the press that are listening and

6   maybe trying to capture the ruling, and so I'll try to be as

7   deliberate as I can be.

8           On May 7th of 2024, the Federal Trade Commission

9   issued a rule banning nearly all existing and future

10  non-compete clauses, finding that non-competes are an unfair

11  method of competition.

12          And, of course, that's published at 89 Federal

13  Register 38342.

14          That rule is slated to take effect on September 4th

15  of 2024, three weeks from today.

16          The plaintiff, Properties of the Villages, Inc., a

17  real estate broker in The Villages whose agents are all subject

18  to non-compete clauses, filed their complaint on June 21st,

19  2024 bringing four counts under the Administrative Procedure

20  Act, 5, U.S.C., Section 706(2); the latter two counts also

21  allege violations of the federal Constitution.

22          In Count I, plaintiff alleges the FTC does not have

23  substantive rulemaking authority over unfair methods of

24  competition.

25          In Count II, plaintiff alleges that even if the FTC

1    has substantive rulemaking authority, the new non-compete rule

2    exceeds that authority.

3         In Count III, plaintiff alleges that even if the FTC

4    has authority to make this rule, it is impermissibly

5    retroactive.

6         In Count IV, plaintiff alleges the non-compete rule

7    violates the commerce clause.

8         I note that the complaint does not allege that the

9    final rule is arbitrary and capricious, as is frequently

10   litigated in APA cases.

11        The Court has federal question jurisdiction, venue is

12   proper in the Ocala Division, and plaintiff, who is subject to

13   the ruling it is challenging, has standing to bring these

14   claims.

15        On July 2nd, 2024, plaintiff filed a motion seeking

16   to preliminarily enjoin enforcement of the new rule against it,

17   and seeking a stay of the September 4 effective date.  The FTC

18   responded, plaintiff replied, and I allowed numerous interested

19   parties to file amicus briefs.

20        In preparation for this hearing, I've read the

21   complaint, the parties' briefs on the motion for preliminary

22   injunction's and stay, all of the amicus briefs, the *Ryan* case

23   out of Texas, the *ATS* case out of Pennsylvania, pertinent

24   portions of the Federal Trade Commission Act, the FTC final

25   rule, parts of the record of the FTC's decision-making process,

1  the dissents authored by two of the five commissioners, and

2  more judicial decisions than I can count, particularly

3  decisions from the Eleventh Circuit and the United States

4  Supreme Court.  And I've now heard helpful argument from

5  skilled lawyers.

6          The questions presented are important and close.  In

7  the compressed time I've had, I've given this my best effort.

8  I'm somewhat comforted in knowing that my decision today is

9  likely not to be the end of it.

10          I'd like to start with the lens through which we're

11  focused today.  Plaintiff is seeking a preliminary injunction

12  asking the Court to enjoin the FTC from enforcing its new

13  non-compete rule against it.  The motion also seeks a stay of

14  the rule, set to go into effect on September 4th, 2024.  The

15  standards for both the preliminary injunction and the stay are

16  essentially the same.

17          There's a Supreme Court case that says that.

18          I'm going to now announce the standard for

19  preliminary injunction in the Eleventh Circuit.  It's

20  black-letter law in the Eleventh Circuit, so I'm not going to

21  bother to cite the cases, because it will just take too long.

22  But this is all, I think, black-letter law that can't really be

23  disputed.

24          In the Eleventh Circuit a preliminary injunction is

25  an "extraordinary remedy never awarded as of right."

1        "Its purpose is merely to preserve the relative

2  positions of the parties until a trial on the merits can be

3  held."

4        "A district court may grant a preliminary injunction

5  only if the moving party establishes that, No. 1, it has a

6  substantial likelihood of success on the merits; No. 2, it will

7  suffer irreparable injury unless the injunction is granted;

8  No. 3, the harm from the threatened injury outweighs the harm

9  the injunction would cause the opposing party; and the

10  injunction would not be adverse to the public interest."

11        When, as here, "the government is the opposing

12  party," "the third and fourth factors merge."

13        "The district court exercises substantial discretion

14  in weighing the four relevant factors to determine whether

15  preliminary injunctive relief is warranted."  And a "failure to

16  show any of the four factors is fatal" to the request for a

17  preliminary injunction.

18        In the Eleventh Circuit, "a preliminary injunction is

19  an extraordinary and drastic remedy not to be granted unless

20  the movant clearly establishes the 'burden of persuasion' as to

21  each of the four prerequisites.  The first factor, substantial

22  likelihood of success on the merits, is 'generally the most

23  important of the four factors.'"

24        To demonstrate a "substantial likelihood of success,"

25  a party need not show "certain" success, but it must be "likely

1   or probable."  A party must do more than show that "its theory

2   of the case is substantial and not frivolous;" rather, it must

3   "convince the court that its theory is likely meritorious."

4          Relevant to this *APA* case, the Supreme Court in the

5   recent case of *Loper Bright Enterprises versus Raimondo*, 144

6   Supreme Court 2244, a 2024 case, very recent, the Supreme Court

7   has stated in overruling *Chevron* that "courts must exercise

8   their independent judgment in deciding whether an agency has

9   acted within its statutory authority, as the APA requires.

10  Careful attention to the judgment of the Executive Branch may

11  help inform that inquiry.

12         And while the court "may not defer to an agency

13  interpretation of the law simply because a statute is

14  ambiguous," "when a particular statute delegates authority to

15  an agency consistent with constitutional limits, courts must

16  respect the delegation, while ensuring that the agency acts

17  within it."

18         As to substantial likelihood of success on the

19  merits, plaintiff raises issues as to each of the four counts

20  of its complaint on its motion for preliminary injunction, but

21  I'll discuss the issues as a whole, as opposed to going by each

22  count.

23         Issue 1:  Plaintiff contends that the FTC does not

24  have substantive rulemaking authority over methods of unfair

25  competition.

1          The FTC's rulemaking authority derives from 15,

2  U.S.C., Section 45, known as Section 5, and 15, U.S.C., Section

3  46, known as Section 6.

4          In Section 5, Congress "empowered and directed" the

5  FTC "to prevent" for-profit businesses "from using unfair

6  methods of competition in or affecting commerce and unfair or

7  deceptive acts or practices in or affecting commerce."

8          That's 15, U.S.C., Section 45(a)(2).

9          And in my recitation I may not always cite the

10  specific case page number or citation, but I'm going to do the

11  best I can, but I don't want to unduly lengthen the

12  presentation.  I think it will be obvious to the reader where

13  I'm -- what I'm referencing.

14          Section 5 also include mechanisms for enforcement

15  actions brought by the FTC to stop a violation of this rule.

16          And that's 15, U.S.C., Section 45(b) through (m).

17          Section 6, titled "Additional powers of the

18  Commission," provides authority for the FTC to undertake

19  various investigations, require reports of various entities,

20  publish periodic information and reports, assist with

21  international investigations, and, in subsection (g), Congress

22  gave the FTC authority for "classification of corporations;

23  regulations" -- that's the title of it -- described as the

24  authority to "from time to time classify corporations and

25  except as provided in section 57a(a)(2) of this title," which

addresses rulemaking with respect to unfair or deceptive acts or practices, "to make rules and regulations for the purpose of carrying out this subchapter."

And that's 46(g) or Section 6(g).  And the operative language there, of course, is to make rules and regulations for the purpose of carrying out the subchapter.

The FTC's position is that given its mission in Section 5 to prevent businesses from using unfair methods of competition, combined with its authority in Section 6(g) to make rules and regulations, the FTC has the authority it needed to pass the non-compete final rule.

Plaintiff raises several points as to why the text, structure, and history of the statute fail to support this authority, and without addressing -- and without addressing every single one, I'll touch on the most significant.

Plaintiff argues that the placement of Rule 6 authority within a list of otherwise ministerial acts such as recordkeeping and publications makes it implausible to believe that Congress was granting the FTC the authority to make substantive rules as opposed to procedural rules.  This is the argument about "hiding an elephant in a mousehole."

Plaintiff also contends that it defies logic to believe Congress would convey such broad authority in the single sentence of Section 6 while devoting 14 separate subsections to the FTC's rulemaking authority with regard to

1 unfair or deceptive acts or practices.

2      Plaintiff argues that Section 6(g) does not have the

3 other indicia of being a substantive rule because it lacks

4 procedural requirements and penalty provisions such as those

5 that accompany the unfair or deceptive acts or practices

6 rulemaking.

7      It argues that if Section 6 granted the FTC such

8 broad rulemaking authority, Congress would not have needed to

9 pass the 1975 Amendments, which are known as the Magnuson Moss

10 Warranty-Federal Trade Commission Improvement Act amendments.

11 That sets out the rulemaking procedure for unfair or deceptive

12 acts or practices.

13      Plaintiff contends that the 1975 Amendment's

14 statement that it is not disturbing "any" other authority to

15 prescribe rules with regard to unfair methods of competition

16 did not convey substantive rulemaking authority in Section

17 6(g).

18      Plaintiff argues that aside from FTC rulemaking in

19 the 1960s and '70s, the FTC only has previously exercised its

20 authority on a case-by-case basis under Section 5, and that it

21 "strains credulity that the FTC had this immense power but

22 declined to exercise it for 50 years."

23      That's a quote from the plaintiff's motion.

24      All of these arguments have some force, but I do not

25 find that plaintiff presents a substantial likelihood of

1    success on the merits with any of them.  Nothing in Section 6

2    says it is limiting the FTC's rulemaking to "procedural" rules.

3           The 1975 Amendment specifically says the FTC's

4    rulemaking with regard to unfair methods of competition is

5    undisturbed.  And the 1980 Amendments recognize that amendments

6    to Commission rules could have annual effects on the national

7    economy in excess of $100,000,000.

8           Read together, the various components of the statute

9    show Congress conferred at least some form of substantive

10   rulemaking authority to the FTC with regard to unfair methods

11   of competition.

12          Two circuit courts have looked at the FTC's

13   substantive rulemaking authority and have found it resides in

14   Section 6 as well.

15          In *National Petroleum v. FTC*, which I won't cite, the

16   D.C. Circuit held that "the plain language of

17   Section 6(g) . . . gives the Commission the authority to make

18   rules and regulations for the purpose of carrying out the

19   provisions Section 5" and that the Commission "is authorized to

20   promulgate rules defining the meaning of statutory standards of

21   illegality the Commission is empowered to prevent."

22          So too in the follow-on Seventh Circuit case *United*

23   *States versus JS&A*, the Seventh Circuit incorporated by

24   reference the *National Petroleum*'s decision -- the *National*

25   *Petroleum*'s "lengthy discussion of the Commission's rulemaking

1   authority under section 6(g)," and agreed with it with
2   approval.
3          And, as Judge Kelley Hodge stated in her recent *ATS*
4   decision, Congress gave the FTC authority to "prevent" unfair
5   methods of competition, not just go after someone who already
6   engaged in it, and that that authority resides in Section 6(g).
7          Issue 2:  Plaintiff argues that the new non-compete
8   rule violates the commerce clause.
9          Plaintiff raises a few constitutional arguments,
10  claiming there's no interstate commerce connection, a
11  separation of powers concern, and the non-delegation doctrine.
12  While again these positions are arguable, I don't find that
13  plaintiff has demonstrated a substantial likelihood of success
14  as to any of them as stand-alone arguments.
15         Issue 3:  Plaintiff argues the new non-compete rule
16  exceeds the FTC's authority.
17         Plaintiff also argues that not all non-competes are
18  unfair competition, pointing to the Sherman Act; that
19  non-competes are in the core domain of state regulation; and
20  challenges the rule as being improperly retroactive.  I'm not
21  persuaded that the plaintiff can show a substantial likelihood
22  of success as to any of these arguments.
23         That leaves us with the plaintiff's position that
24  this new rule cannot stand because it is subject to the major
25  questions doctrine.

1       If I were to stop at this point, I would conclude

2   that the plaintiff, though making a plausible case, has not

3   shown a substantial likelihood of success on the merits.  But

4   recent jurisprudence from the Supreme Court, in combination

5   with the breadth and the scope of the FTC's final rule,

6   requires me to consider the FTC's authority to issue the final

7   rule in the context of the major questions doctrine.

8       In discussing these issues, I have considered, among

9   other, these key cases:  From the Supreme Court, *Biden v.*

10  *Nebraska*, 143 S.Ct. 2355, a 2023 case; *West Virginia v. EPA*,

11  597 U.S. 697, a 2022 case; *National Federation of Independent*

12  *Business v. Department of Labor*, 595 U.S. 109, a 2022 case;

13  *Alabama Association of Realtors v. Department of Health and*

14  *Human Services*, 594 U.S. 758, a 2021 case; *Utility Air*

15  *Regulatory Group v. EPA*, 573 U.S. 302, a 2014 case; *FDA v.*

16  *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, a 2000 case.

17      I've also considered some circuit authority from the

18  Tenth Circuit, *Bradford v. Department of Labor*, 101 F.4th 707,

19  10th Circuit, 2024; and from the Fourth Circuit, *North Carolina*

20  *Coastal Fisheries Reform Group v. Captain Gaston LLC,* 76 F.4th

21  291, a 4th Circuit 2023 case; and from my own circuit, the

22  Eleventh Circuit case of *West Virginia v. U.S. Department of*

23  *Treasury*, 59 F.4th 1124, 11th Circuit 2023, also touches on the

24  major questions doctrine.

25      I have also considered the rule itself and the

1    dissenting decisions of FTC Commissioners Ferguson and Holyoak,

2    who discuss the major questions implication of the final rule.

3    The amicus brief of the administrative law professors also

4    discusses the major questions doctrine, as do the parties in

5    their brief.  So I've had a lot of exposure to the rule through

6    that reading.

7           Under the major questions doctrine, the Court assumes

8    that Section 6(g) of the FTC Act grants some type of

9    substantive rulemaking authority and that there's a plausible

10   textual basis for it.  But the question is:  Does it grant the

11   FTC the authority to issue this particular rule?  Does the rule

12   implicate a major question?

13          The major questions doctrine is the name recently

14   given to a long-standing principle governing the interpretation

15   of statutes conferring power on administrative agencies.  The

16   principle is this:  When an agency claims to have the power to

17   issue rules of "extraordinary . . . economic and political

18   significance," it must "point to 'clear congressional

19   authorization' for the power it claims."

20          The doctrine assumes, as is true here, that the FTC's

21   reading of its authority under Section 6(g) is plausible, but

22   requires more, given the significant consequences of the rule.

23          As the cases discuss, as, for example, in the *North

24   Carolina Coastal Fisheries* case from the Fourth Circuit, the

25   major questions doctrine may be understood in either of two

ways; first, as a clear-statement rule enforcing the
constitutional prohibition on the delegation of legislative
authority, thereby protecting the separation of powers.

This rule does not forbid Congress from conferring on
agencies the power to make rules of vast economic and political
significance; rather, to protect the separation of powers, the
rule requires Congress to state its intention to confer that
power clearly and unambiguously.

Second, the doctrine may be understood as the
"context" against which a statutory delegation is enacted, and
therefore "a tool for discerning, not departing from, the
text's most natural interpretation."

And in talking about this I am borrowing language
from the cases that I told you that I had read.  I'm not trying
to match them up particularly and cite them precisely in my
reading, but I am relying on language from the Supreme Court
cases.

Thus -- and so let me go back.

The doctrine may be understood as the "context"
against which a statutory delegation is enacted, and therefore
"a tool for discerning, not departing from, the text's most
natural interpretation.  Thus, common sense, informed by
constitutional structure, tells us that Congress normally
intends to make major policy decisions itself, not leave those
decisions to agencies."

1    It tells us we "should 'typically greet' an agency's

2    claim to 'extravagant statutory power' with at least some

3    'measure of skepticism,'" or, as the cases say, to "hesitate"

4    before finding the agency action lawful.

5    To determine whether a major question is implicated,

6    the Supreme Court looks at a number of non-exhaustive factors;

7    first is whether the rule affects "a significant portion of the

8    American economy."

9    Here, the Commission estimates that one-fifth of

10   American workers, or approximately 30 million employees, are

11   subject to a non-compete that would be affected by this rule.

12   While the FTC has tried to estimate the economic

13   costs and benefits of the final rule, they are hard to measure

14   with precision.

15   But, by one metric, the FTC estimates that employers

16   will pay from 400 to 488 billion dollars more in wages over ten

17   years under the rule, which, of course, might be a good thing

18   for wage earners, but is a significant economic impact by

19   anyone's measure.

20   The Commission lists other multi-billion dollar

21   financial impacts as well.

22   And that is in a chart found as part of the rule at

23   89 Federal Register at 38470.  And you heard in reference to

24   argument today some other numbers, potentially 2.7 percent

25   impact on business revenue.  Also, the FTC has acknowledged

1   that the cost of compliance in the aggregate will be in the

2   billions of dollars.

3           So suffice it to say that the transfer of value from

4   employers to employees, from some competitors to other

5   competitors, from existing companies to new companies, and

6   other ancillary effects, will have a huge economic impact.  And

7   there is likely other economic activity attributable to the

8   rule that the FTC has not even attempted to account for.  Thus,

9   the final rule does affect a significant portion of the

10  American economy.

11          The Supreme Court also considers the political

12  significance of the rule and whether it regulates in an area

13  that has previously been the domain of state law, or implicates

14  federalism concerns.  Neither the FTC nor any other federal

15  agency has previously tried to regulate non-competes in a

16  meaningful way.  However, non-competes have been the subject of

17  substantial debate and regulation in the states, including some

18  states which have banned them altogether.

19          The final rule would preempt state laws regarding

20  non-competes to the extent that those state laws permitted them

21  in certain circumstances.

22          There is a long history of both common law of

23  contracts and increasingly a statutory overlay that regulates

24  non-competes at the state level.  Non-competes have also been

25  the subject of political debate at the federal level with, as

1  we heard today, unsuccessful legislative efforts over the years

2  to regulate non-competes.

3      I even read one of the FTC's commissioners who was in

4  the majority on the final rule -- said that she was still

5  hopeful of and working toward a legislative enactment to

6  address non-competes.

7      The Tenth Circuit also observes that the major

8  question doctrine is more likely to be implicated when the

9  agency rule constitutes "an enormous and transformative

10  expansion of regulatory authority," as opposed to the

11  government's procurement authority.  Of course, the final rule

12  here is a hugely consequential expansion of regulatory

13  authority.

14      Another major question factor which does favor the

15  FTC is that, to the extent that non-competes can be categorized

16  as "unfair method of competition," the final rule can be

17  considered as in the "wheelhouse" of the FTC under Section 5.

18  And the FTC Act does contemplate that large sums of money can

19  be implicated by FTC rulemaking, as I previously adverted to.

20      However, on balance, given the sweep and the breadth

21  of the final rule, including its application to existing

22  contracts, I find it substantially likely -- and the plaintiffs

23  have shown me this -- that it presents a major question as

24  defined by the Supreme Court.

25      The next issue then is has Congress, in Section 5 and

1    6(g), rendered a sufficiently clear expression of legislative

2    intent to authorize the final rule.

3         Section 5 is admittedly a broad grant of authority to

4    "prevent unfair methods of competition."  It does not address

5    rulemaking at all, just case-by-case adjudication authority,

6    however.

7         Section 6(g) is part of a section that deals

8    primarily with reports and investigative powers.  And even the

9    "rules and regulations" portion of Section 6(g) has to share

10   space with "classifying corporations," which is a more

11   ministerial function.

12        That 6(g) may not be the behemoth that the Commission

13   says it is is evidenced by the fact that the Commission has

14   never tried substantive rulemaking of this magnitude before

15   this and had never even brought non-compete enforcement actions

16   until it announced some consent decrees literally the day

17   before it announced its Notice of Proposed Rulemaking.

18        I think there was one back in 1963 that had something

19   to do with non-competes, so I want to add that caveat, but I

20   believe that was overturned by the Seventh Circuit.  That's the

21   *Snap-on* case.

22        So while these eleventh-hour non-compete consent

23   decrees that the FTC talks about allows the Commission to say

24   that "non-competes have already been subject of FTC scrutiny

25   and enforcement actions, so subjecting them to rulemaking is a

1  more incremental, and thus less significant, step than it would

2  be for an agency to wade into an area not currently subject to

3  its enforcement authority," as the FTC says at page 38353 of

4  the rule, given the timing of these consent decrees a day

5  before the announcement of the proposed rulemaking, and the

6  lack of previous enforcement efforts, this argument by the FTC

7  carries little weight.

8       Indeed, "this lack of historical precedent, coupled

9  with the breath of authority the Commission now claims, is a

10  telling indication that the final rule extends beyond the

11  Commission's legitimate reach," citing the *National Federation*

12  *of Independent Business* cases -- case, 595 U.S., at 119-20.

13       Indeed, the FTC's new assertion of this expansive

14  authority in the long-standing but relatively dormant Section

15  6(g) is further evidence that the final rule is not authorized.

16       I have considered the *National Petroleum* case, as I

17  have said earlier, but wonder whether faced with the sweeping

18  nature of the final rule and the Supreme Court's recent major

19  questions jurisprudence, it would have ruled in the FTC's favor

20  in today's case.

21       I've also considered the *ATS* court's view that the

22  major questions doctrine "is not applicable."

23       I agree with the *ATS* court that the doctrine -- the

24  major questions doctrine is reserved for "extraordinary" cases

25  "in which the history and the breadth of the authority that the

1    agency has asserted, and the economic and political

2    significance of that assertion, provide a reason to hesitate

3    before concluding that Congress meant to confer such

4    authority."

5           So it has to be extraordinary.  You can't -- you

6    can't have a major questions inquiry in every agency rulemaking

7    case or every agency action.  And I recognize that.  It does

8    have to be extraordinary.

9           And I further don't take issue with the *ATS* court's

10   finding that the non-compete rule deals with an issue of unfair

11   methods of competition so it operates within the FTC's "core

12   mandate."  But I disagree with the *ATS* court that the

13   Commission has ever exercised its Section 6(g) rulemaking power

14   in the scope and the manner that it seeks to do with the final

15   rule.

16          Borrowing from Justice Barrett's concurring opinion

17   in *Biden v. Nebraska*, if a parent gives a babysitter a credit

18   card and says "make sure the kids have fun while we're out,"

19   the parent might expect that the babysitter would take the kids

20   out for ice cream, but would not expect the babysitter to take

21   the kids on an overnight trip to Las Vegas.  Likewise here:

22   Without clear Congressional permission, the final rule, the

23   FTC's equivalent of a trip to Las Vegas, is unauthorized.

24          An administrative agency's power to regulate must

25   always be grounded in a valid grant of authority from Congress.

1   With a rule as sweeping and consequential as this one, the

2   Section 6 language, both by its text, placement, context, and

3   history, falls short.

4          I find that the plaintiff has shown a substantial

5   likelihood of prevailing on its claim that the final rule

6   exceeds the FTC's authority under its organic act, as stated

7   and alleged in Count II of plaintiff's complaint.

8          Of course, my ruling here is based on the law, not on

9   the policy questions of the proper role of non-competes in the

10  American economy, a question decidedly outside of my purview,

11  nor does my decision on this specific rule require me to

12  determine the parameters of the FTC's substantive rulemaking

13  authority generally or in a different case.

14         For example, it's not before me as to whether a

15  rulemaking that would bar non-competes as to hourly workers or

16  as to a specific industry would pass muster.  That's not before

17  me.  I'm only dealing with the final rule that I have in front

18  of me.

19         So I now turn to the other factors to secure a

20  preliminary injunction.  First, irreparable harm.

21         To demonstrate irreparable harm, a party must show it

22  will suffer injuries that are "neither remote nor speculative,

23  but actual and imminent."

24         And, again, this is black-letter Eleventh Circuit

25  law.

1        "An injury is irreparable only if it cannot be undone

2    through monetary remedies."

3        "The possibility that adequate compensatory or other

4    corrective relief will be available at a later date . . .

5    weighs heavily against a claim of irreparable harm."

6        The Court rejects the FTC's argument that by not

7    filing suit and its motion immediately after the rule was

8    passed, POV sat on its rights and forfeited any argument that

9    the harm is irreparable.  Unlike cases in which that might be

10   true, the rule has not yet gone into effect, so POV has not

11   allowed that to have consequence before it filed its suit and

12   motion.

13       Also, the compressed period from when the final rule

14   issued on May 7th, 2024, and its effective date of September

15   4th, 2024, made this timing all but inevitable.

16       POV has demonstrated that if the rule goes into

17   effect against it, it will incur costs to review its existing

18   contracts for compliance with the rule, and to strategize on

19   how best to change their existing agreements and business

20   models.

21       And I understand the objection to the affidavit

22   that's attached to the reply.  I would typically allow

23   additional affidavit practice, because injunctions are done on

24   affidavit and not -- we don't have evidence, so we don't have

25   somebody able to testify and to meet other arguments.

1        But even if I disregard that affidavit, it just makes

2   common sense that there are going to be costs -- and, in fact,

3   the Commission recognized those costs in its own rulemaking.

4   There are going to be compliance costs to change contracts, to

5   enter into decisions on how to go forward from here, to figure

6   out how to deal with existing contracts.

7        There's obviously going to be a compliance cost that

8   are more than de minimis.  And there is no readily available

9   way to recover those monetary damages from the government

10  should the ultimate decision be made that the rule is invalid.

11       There's also the business disruptions caused by

12  having to comply with the rule while its efficacy is being

13  litigated, which I think also feeds into a finding of

14  irreparable harm.

15       So I'm going to find if the FTC is not enjoined from

16  enforcing the new rule against POV it will suffer actual and

17  imminent harm that cannot be undone through money damages.

18       And, of course, the Eleventh Circuit case that

19  recognizes that unrecoverable monetary loss is an irreparable

20  harm is *Georgia v. President of the United States*, 46 F.4th

21  1283, at 1302.  That's a 2022, 11th Circuit case.

22       As to the final two factors needed to secure an

23  injunction, the balance of equities and the public interest,

24  they too favor entry of a preliminary injunction.  While it is

25  true as the FTC says that the public interest is often of

1    concern when the government "is enjoined by a court from

2    effectuating statutes enacted by representatives of its

3    people," here plaintiff has demonstrated a substantial

4    likelihood that the government may in fact not be operating

5    within the bounds of the statute enacted by those

6    representatives.  Also, the FTC will not be substantially

7    harmed by the maintenance of the status quo until a final

8    decision on the validity of the final rule is reached.  These

9    two factors -- final factors favor entry of an injunction.

10          Plaintiff's motion for a preliminary injunction is

11   granted.  The Court will enter a preliminary injunction

12   prohibiting enforcement of the final rule as to the Properties

13   of the Villages, Inc.  The injunction only applies to the

14   Properties of the Villages; the Court is not -- repeat not --

15   entering a stay of the final rule generally, nor is the Court

16   entering an injunction of nationwide application.  It is

17   strictly limited to the party that's before the Court that

18   brought the suit.

19                          *  *  *  *  *

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 15th day of August, 2024.


                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC